## IN THE SUPREME COURT, STATE OF WYOMING

## 2022 WY 1

*October Term, A.D. 2021*

**January 5, 2022**

BOARD OF PROFESSIONAL
RESPONSIBILITY, WYOMING
STATE BAR,

Petitioner,

v.

DONALD L. TOLIN, WSB #5-1699,

Respondent.

D-20-0008

## ORDER OF THREE-YEAR SUSPENSION

[¶1]     **This matter** came before the Court upon the Board of Professional Responsibility's Report and Recommendation for Three-Year Suspension, filed herein November 30, 2021. The Report and Recommendation was filed pursuant to Rule 12 of the Wyoming Rules of Disciplinary Procedure, which governs stipulated discipline. Now, after a careful review of the Report and Recommendation and the file, the Court finds the Report and Recommendation should be approved, confirmed, and adopted by the Court, and that Donald L. Tolin should be suspended from the practice of law for three years. It is, therefore,

[¶2]     **ORDERED** that Deputy Bar Counsel's Motion to Strike Page 7 of Report and Recommendation for Three-Year Suspension in Its Entirety, e-filed herein December 3, 2021, is granted. The attached Report and Recommendation for Three-Year Suspension, has been amended to include the corrected page 7 provided by Deputy Bar Counsel. In addition, this Court has redacted a portion of page 4 of the Report and Recommendation; and it is further

[¶3]     **ADJUDGED AND ORDERED** that the Board of Professional Responsibility's Report and Recommendation for Three-Year Suspension, which is attached hereto and incorporated herein, shall be, and the same hereby is, approved, confirmed, and adopted by this Court; and it is further

[¶4]  **ADJUDGED AND ORDERED** that, as a result of the conduct set forth in the Report and Recommendation for Three-Year Suspension, Respondent Donald L. Tolin shall be, and hereby is, suspended from the practice of law for three years, with the period of suspension to begin January 5, 2022; and it is further

[¶5]  **ORDERED** that, during the period of suspension, Respondent shall comply with the requirements of the Wyoming Rules of Disciplinary Procedure, particularly the requirements found in Rule 21 of those rules.  That rule governs the duties of disbarred and suspended attorneys; and it is further

[¶6]  **ORDERED** that, pursuant to Rule 25 of the Wyoming Rules of Disciplinary Procedure, Respondent shall reimburse the Wyoming State Bar the amount of $50.00, which represents the costs incurred in handling this matter, as well as pay an administrative fee of $750.00.  Respondent shall pay the total amount of $800.00 to the Wyoming State Bar on or before March 1, 2022.  If Respondent fails to make payment in the time allotted, execution may issue on the award; and it is further

[¶7]  **ORDERED** that the Wyoming State Bar may issue the agreed press release contained in the Report and Recommendation for Three-Year Suspension; and it is further

[¶8]  **ORDERED** that the Clerk of this Court shall docket this Order of Three-Year Suspension, along with the incorporated Report and Recommendation for Three-Year Suspension as a matter coming regularly before this Court as a public record; and it is further

[¶9]  **ORDERED** that, pursuant to Rule 9(b) of the Wyoming Rules of Disciplinary Procedure, this Order of Three-Year Suspension, along with the incorporated Report and Recommendation for Three-Year Suspension shall be published in the Wyoming Reporter and the Pacific Reporter; and it is further

[¶10]  **ORDERED** that the Clerk of this Court cause a copy of this Order of Three-Year Suspension to be served upon Respondent Donald L. Tolin.

[¶11]  **DATED** this 5th day of January, 2022.

**BY THE COURT:**

/s/

**KATE M. FOX**
**Chief Justice**

# BEFORE THE BOARD OF PROFESSIONAL RESPONSIBILITY

## WYOMING STATE BAR

IN THE SUPREME COURT
STATE OF WYOMING
FILED
Nov 30
DEC - 6 2021
SHAWNA GOETZ CLERK
by CHIEF DEPUTY

In the matter of )
DONALD L. TOLIN )
WSB # 5-1699, )
  )  **WSB No. 2021-077**
Respondent. )
  )  **D-20-0008**

---

## REPORT AND RECOMMENDATION FOR THREE-YEAR SUSPENSION

---

THIS MATTER came before a Review Panel of the Board of Professional Responsibility via video conference call on the 17th day of November 2021, for consideration of the parties' Stipulation for Three-Year Suspension pursuant to Rules 9 and 12 of the Wyoming Rules of Disciplinary Procedure. Present on the call were Review Panel members Rob Jarosh, Janine Thompson, and Deb Wendtland. Melinda S. McCorkle, Deputy Bar Counsel, appeared on behalf of the Wyoming State Bar. Respondent Donald L. Tolin appeared on his behalf. The Complainant was also present during the video conference call. The Review Panel, having reviewed the Stipulation, the supporting Affidavit and being fully advised in the premises, finds, concludes and recommends:

### FINDINGS

1. Respondent is a private practitioner with an office in Casper, Wyoming. Respondent has been licensed to practice law in the State of Wyoming since 1978. On March 20, 2019, Respondent was suspended for thirty days for professional misconduct for violating Wyoming Rules of Professional Conduct 1.3 (diligence), 1.4 (communication with client), and 3.2 (expediting litigation). *Bd. of Prof. Resp. v. Tolin*, 436 P.3d 453 (Wyo. 2019).

1

## Representation of Complainant

2.      On June 5, 2019, the Complainant (hereinafter "Wife") emailed Respondent requesting legal advice about a possible separation or divorce from her husband. Within that first email to Respondent, Wife made clear that her overriding concern was that her husband was concealing assets and requested guidance in how to protect herself. Wife paid Respondent a $5,000.00 "availability retainer" on June 14, 2019.

3.      On June 18, 2019, Wife sent Respondent a lengthy email addressing concerns about improper use of marital assets:

> To date, [husband] has moved over approximately $23,000 from the joint account to his LWSS (his business account). He has purchased a down payment on a Harley $3,500 (May) with which he plans to go through and purchase today, despite the fact that I have told him that I did not agree with this or the manner in which he has made this purchase. I finally found out the total purchase of the Harley was $28,000. He put $3,5000 [sic] down already and now plans on putting another $12,000 (approximately) down today. This will leave him about $11,500 for financing. **I am telling you this as I feel this large purchase is taking away from the marital property behind my back and I would like this to be accounted for in the event a divorce transpires. If I am remembering correctly, you said he will be held accountable for these transactions.**
>
> Can you provide me clarity with this question?
>
> Also, with the $23,000 moved from the joint account to his business account, he has also "loaned" approximately $7,000 to a "friend whose child is in need"???? (Despite the fact his own child has been diagnosed with a life-long illness). Very vague and I am totally questioning this too. Once again, taking away from the marital property and giving to someone or something else. (I still suspect a pornography addiction or he is seeing someone else). Nonetheless, I think he is hiding money at this time and would like a very CLEAR accounting of these transactions. I plan on digging further, but felt this is information that you need to know.
>
> As of Sunday, I have asked him to be transparent with this business account. While he has not provided me with an updated register, I have not seen anything suspicious to date. I will let you know if I do.
>
> He informed me today that he is selling the jet skies to a friend for $5,000. I asked where he plans on putting the money from this sale, he said he was going

2

to give it to me. I asked that he deposits the money into the joint savings account and we will decide later after we have decided the direction we need to go with this marriage. This is my way of being transparent and following what is equitably distributed in the event of a divorce.

As of Sunday, June 16, 2019, I have asked him to include me in on ALL decisions with the finances. He is not to sell, purchase, and/or move money without my knowledge and/or approval. He has been informed and he verbally agreed. **If he does not hold up on his end of the deal, he is aware that there will be an accounting on his end.**

(emphasis added).

4.  In Respondent's response to Wife's email, Respondent acknowledged Wife's concerns about assets and stated, "I'm still concerned about his access to your accounts."

5.  On June 18, June 26, July 5, and July 11, 2019, Wife reiterated concerns about hiding assets. On July 15, 2019, Wife again addressed assets and inquired about securing marital assets:

My question is will there need[s] to be an official separation date in an effort to get my portion of what he has already taken from the marital property?
***
I have had several people tell me I will not be able to recoup what he has taken/sold/spent to date as nobody has filed for the divorce, and a divorce complaint needs to be filed to freeze current assets. I would much rather get legal advice from you as I know this is accurate. If you can please provide clarity to my questions, I will be able to decide how best to move forward.

6.  Respondent advised Wife that filing a complaint for divorce "sooner rather than later" is better and that the property issues are "complicated".

7.  Wife spoke with Respondent on September 19, 2019 regarding concerns about assets. Wife asserts Respondent told her he would file a motion to freeze assets and take temporary ownership of the marital home upon filing of the divorce. On October 4, 2019, Wife emailed Respondent regarding the sale of assets. Respondent did not respond to this email.

8.     Wife was served divorce papers on Saturday, April 4, 2020. That day, Wife gave Respondent a copy of the Complaint for Divorce and communicated in writing that her primary concern was the reduction of assets. Wife requested a full accounting of her husband's assets.

9.     On April 8, 2020, Wife filled out a "Confidential Client Information" form, again stating: "I would like a full financial accounting with money he has been hiding since March 2019." In that document, Wife repeatedly expressed concerns about her husband's "increased spending" and "moving assets". On April 9, 2020, Respondent asked Wife whether she and her husband had reached an agreement about the division of property and debt, to which Wife replied in the negative. Respondent replied:

> Getting the answers you've asking about, would not happen in a Stipulated Divorce. Most divorces are never just "stipulated" at the beginning. However, if they can not [sic] be resolved between the parties after discovery and mediation, then they are set for a bench trial before the judge, which usually lasts a day.
>
> For some reason, it appears to me that [Husband] thinks you will just agree to whatever he "tells" you, hence a "stipulated divorce." I hear this often from client's spouses ... "we don't need to get the attorney's [sic] involved" from the cases where the attorneys really need to be involved because of major issues regarding the division of property and debt, and the attempt at overpowering and manipulation by the spouse of my client.

10.     Within the April 9th email string, Wife again expressed her fear that her husband was hiding assets, stating, "I am hoping through discovery that what he has spent his money that has been hidden will be brought out in the open." She further stated:

> This is where I am going to hand it over to you for legal guidance. I am requesting a full accounting of his assets, bank accounts, credit cards, LWSS bank account, Venmo and Zelle accounts (maybe more I am unsure) and amazon account as I believe the amazon account charges may shed some light on his behaviors as well.

(emphasis added).

11.     On April 9, 2020, Respondent provided Wife with standard forms so that she could begin working on her initial disclosures. Respondent advised that the initial disclosures are "part

4

of the automatic discovery required in every divorce" and "more formal discovery" can commence after disclosures are exchanged. Respondent confirmed that initial disclosures are usually due thirty days after the counterclaim and answer are served but extensions may be granted as a matter of course.

12. On April 21, 2020, Wife notified Respondent about suspicious charges, concerns that her husband was attempting to open an account, and other concerns regarding her husband's misuse of marital assets. Wife asked about information needed for her counterclaim, stating:

> I guess this is where my thoughts are with what I understood our conversation to be last September. I would like your professional input and recommendations at this time as this is outside of the scope of my knowledge.
>
> I really need you to know that I am trying to let you take over and guide me through this process as I have never gone through a divorce.

13. On April 22, 2020, Wife reiterated the importance of discovering "spending patterns" as she believed her husband had engaged in "indiscretions" with their finances.

14. On April 29, 2020, Wife sent Respondent an email inquiring about the recommendations he previously made about filing motions to freeze assets and for temporary ownership of the marital property. Respondent did not provide a substantive response or take any action on Wife's request.

15. On May 13, 2020, Wife again reiterated that she believed her husband had spent more marital assets and wanted to speak with him about such discoveries but was focused on initial disclosures because they were due the following week.

16. On May 19, 2020, Wife contacted Respondent to express concern about completing initial disclosures by the May 23 due date. Respondent told Wife to do the best she could. He did not indicate that the disclosure deadline was extended.

5

17.     On May 22, 2020, Wife provided Respondent with her initial disclosure document and supporting documents and asked whether Respondent had received her husband's disclosures. On May 23, 2020, Wife asked whether her husband was required to produce initial disclosures within thirty days of the Answer. Respondent replied that he had not yet received disclosures and affirmed that her husband was under the same time constraints.

18.     On May 27, 2020, Wife emailed Respondent requesting a meeting to discuss several concerns about misuse of marital assets and alleged that her husband had transferred $100,000.00 into a separate bank account. Wife ended the email stating: "We need to freeze all the assets to include the new bank account of $100,000 associated with his mother." She again inquired about her husband's initial disclosures. Respondent responded that he has "heard nothing further from [husband's] attorney". The following day, Wife asked whether Respondent had provided her initial disclosures to opposing counsel. Respondent replied, "I have not." On May 29, 2020, Wife again inquired into the status of her husband's initial disclosures, complaining that he should have to timely provide disclosures. Respondent did not answer Wife's inquiry about the status of her husband's disclosures.

19.     On June 5, 2020, Wife again asked whether Respondent had received any documents or information from Husband's attorney. Respondent replied, "Nothing new to report."[1] These emails were contained within the same initial thread asking Respondent to freeze assets. At no time did Respondent respond to Wife's request for a meeting, concerns about assets, or request to freeze assets.

20.     On June 16, 2020, Respondent emailed Wife to inform her that Husband's attorney filed a request for trial. That day, Respondent and Wife spoke for approximately 30 minutes.

---

[1] Respondent charged $20.00 for each of these emails – a total of $40.00 for these seven words.

21.     The District Court required mediation to occur prior to setting a trial date. On June 17, 2020, Wife requested a delay in mediation, stating:

> [A]s previously discussed, I would like the discovery to be completed as I believe [Husband's] money trail (spending habits) will provide some answers to my suspicion and the closure I am seeking.... **The discovery is a must for me.**

(emphasis added).

22.     On June 18, 2020, Wife inquired about meeting with Respondent before he produced initial disclosures to Husband's attorney. Respondent replied that he would assemble Wife's initial disclosures, after which, they would meet.

23.     Respondent had no further communication with Wife regarding initial disclosures until August 10, 2020.

24.     Husband and Wife were ordered to complete mediation before proceeding to trial. Between July 2 and August 10, 2020, the mediator's office proposed twenty-eight possible mediation dates spanning from August 25 through October 30, 2020. Respondent did not communicate with Wife about any proposed dates or notify her that a mediator was selected until August 10.

25.     In response to Respondent's May 10, 2020, email regarding mediation, Wife stated:

> I have expressed concers [sic] with the suspicion of [Husband] hiding assets and have previously stated I am not willing to set a mediation date without the rule 26 being exchanged by both parties and discovery completed. Have you received [Husband's] rule 26 or any other discovery?
>
> I want to go into medication [sic] prepared and not be scrambling for his information during limited time during mediation. Also, I do want you present during mediation and I do not feel comfortable with a zoom mediation.

26.     Wife also expressed concerns about a potential conflict with the mediator and asked whether a trial date had been set. Respondent responded, "Court dates are not set until court has been notified that mediation was not successful. Nothing further has been received from his

7

attorney's office." He also inquired into the perceived conflict with the mediator. Wife again asked, "I would like to know what your next move is with the initial disclosure and discovery." Respondent did not respond to Wife's inquiry and had no further communication with Wife until she terminated his representation on August 18, 2020.

27. On August 18, 2020, Wife directed Respondent to: (1) transfer her entire file, including all emails, to new counsel; (2) file a motion to withdraw; and (3) provide an invoice identifying the services performed so that the remaining fee may be refunded. Respondent did not respond to Wife's request.

28. On August 24 and August 25, Wife's new attorney requested an update from Respondent about Wife's requests. Wife reiterated, "I am sending you a second request to forward my complete file to [counsel's] office. Please do so no later than Friday, August 28, 2020. If you are unable to meet this deadline please reach out to [Wife's new counsel]."

29. On August 26, Wife's attorney asked again about the return of a portion of the unearned $5,000.00 paid by Wife. Respondent did not respond.

30. On August 31, 2020, Respondent spoke with the mediator even though he had been terminated on August 18, 2020 and was no longer authorized to speak on Wife's behalf.

31. On September 3, 2020, Respondent informed Wife, "I was finally able to talk to the assigned mediator [] as I told you I would, and she is now aware of your concern that a conflict exists between you and her; [sic] and that she should not be mediating your divorce case." Respondent attached a copy of the Representation Agreement to that email.

32. Despite Wife's repeated directives to exchange initial disclosures and commence discovery, Respondent never did so. Despite expressing fears since June 5, 2019, that her husband

8

was hiding assets and demanding a full accounting since June 16, 2019, Respondent never requested an accounting from Wife's husband.

33. Upon receipt of Wife's Complaint, Deputy Bar Counsel asked whether Respondent exchanged initial disclosures with Husband's attorney. Respondent replied:

> I had not yet exchanged Defendant's Rule 26 Initial Disclosures with opposing counsel. Opposing counsel had not yet provided Plaintiff's Rule 26 Initial Disclosures to me. I understood that [Wife] was still working on finalizing her Defendant's Rule 26 Initial Disclosure information to me, as she continued to provide me with updates and additional supporting documents.

34. Respondent never informed Wife that initial disclosures were not being exchanged because he was waiting for additional documents from her. It is clear that the delay was not based upon a lack of documents or information.

35. Accordingly, while initial disclosures were due on or about May 22, 2020, Respondent made no effort to abide by his client's clear directives to exchange disclosures and commence discovery. He continued to represent Wife for nearly three months past the disclosure deadline.

### Interactions with Opposing Counsel

36. On June 16, 2020, Respondent notified Wife that a Court-ordered mediation was pending. On July 2, 2020, the mediator contacted the parties to schedule the mediation. Respondent replied on July 8, 2020, stating that he was not available on any of the five proposed dates. The same day, nine additional dates were proposed by the mediator and Husband's attorney. Respondent did not respond.

37. On July 21, 2020, the mediator's office requested a response from Respondent. On July 22, 2020, Respondent responded to the mediator, but did not include Husband's attorney, as

9

follows, "Our schedules are in flux. We should have a better feel for everything by the end of this week. Sorry."

38. On July 24, 2020, Husband attorney's paralegal emailed Respondent about mediation dates, to which Respondent replied that he was reviewing the dates and would respond later.

39. On July 28, 2020, the mediator again requested a response from Respondent. Respondent asserted that he was not available.

40. The mediator subsequently proposed six new dates. Opposing counsel responded the same day, stating:

All of the proposed October dates work for [Husband's attorney].

Don: Is everything okay? Are you out of town or scheduled to be out of town in August and September? **As of right now we are looking at scheduling mediation in this case into almost November, which is 4+ months from the June 17, 2020 Order requiring mediation. Do you not have ANY dates in August or September that would work?** [Husband's attorney] is willing to rearrange his schedule, if he can, to try to accommodate you. I know you can attend mediation via phone or skype if needed??? I hope everything is okay? ...

(emphasis added). Respondent did not respond.

41. On August 10, 2020, the mediator proposed eight additional dates, noting that the parties could appear in person, via zoom, or via phone, stating, "I am following up because I really need to get this mediation set."

42. Respondent forwarded this email to Wife, at which time he learned about a potential conflict with the mediator.

43. Respondent did not contact Wife about the mediator or mediation dates prior to August 10. Consequently, after six weeks of attempting to schedule a mediation, Respondent

10

finally learned of the potential conflict and contacted the mediator, stating, "I just have to resolve an issue with her that has just come up, before we look at scheduling this particular mediation."

44. On August 26, 2020, opposing counsel emailed the mediator and Respondent about the proposed dates:

Just following up ...

[Husband's attorney] says if we don't have communication from Mr. Tolin by the end of this week, on Monday he will be filing a Motion for the Court to Waive the Mediation Requirement and Set a Trial in this matter. This mediation was Ordered on June 17, 2020 which is more than two months ago.

45. On August 27, 2020, the mediator responded that she was still waiting for pending dates to be approved by Respondent. Respondent had not notified the mediator or opposing counsel that his representation terminated on August 18, 2020. Respondent did not respond to these emails.

46. On August 31, 2020, Respondent verbally informed the mediator that he was no longer counsel for Wife but had not yet received an Order from the Court granting withdrawal.

47. On September 12, 2020, Respondent notified the mediator and Husband's attorney via email that he had been granted leave to withdraw from the case.

### Respondent's Billing Practices and Failure to Provide Invoice to Wife

48. Respondent received Wife's $5,000.00 "availability retainer" on June 14, 2019. On August 18, 2020, Wife terminated Respondent's representation. Respondent never generated or sent an invoice to Wife during this fourteen-month span.

49. On August 18, 25, and 26, 2020, Wife requested an invoice identifying the services performed so that the remaining fee could be refunded to pay for newly-retained counsel. Respondent did not respond to the requests for an invoice. On September 3, 2020, Respondent simply sent Wife a copy of the Representation Agreement.

11

50. When Wife filed the Complaint on September 17, 2020, she still had not received an invoice detailing the services performed.

51. Section 3.A of Respondent's Representation Agreement states:

**AVAILABILITY RETAINER:** The CLIENT agrees to pay the FIRM an availability retainer of **FIVE THOUSAND DOLLARS ($5,000.00)** all of which is fully earned upon receipt and may be deposited directly into the FIRM's operating bank account when received from the CLIENT. This amount once fully paid by the CLIENT, is non-refundable, and will not be placed in the FIRM'S IOLTA Lawyer's Trust Fund Bank Account. The CLIENT understands and agrees that this **FIVE THOUSAND DOLLARS ($5,000.00)** availability retainer represents the minimum fee that will be charged by the FIRM for the representation of the CLIENT by the ATTORNEY in the matters more fully described in paragraph 1.A. above. This availability retainer represents the FIRM's agreement to make the ATTORNEY available for representation of the CLIENT with the understanding that other work which could have been taken on by the FIRM, has been and will continue to be declined in order to appropriately address the CLIENT matters described in paragraph 1.A. above. In other words, while the ATTORNEY is spending his limited time working on the CLIENT case, he is unable to spend that same time working on other cases that would otherwise generate the same or more revenue to the FIRM and the ATTORNEY from other paying clients. This availability retainer gives the CLIENT reasonable access to ATTORNEY at reasonable times.

Section 3.C states:

**EXCESS TIME AND COSTS:** If the actual time expended by the ATTORNEY times the standard rate of two hundred dollars ($200.00) per hour plus COSTS exceeds the amount of the availability retainer paid to the firm by the CLIENT, the CLIENT agrees to pay the balance to the FIRM upon receipt of the bill/invoice by the CLIENT. Invoices may be sent on a monthly or less frequent basis, but are due in full on receipt, regardless of when received. The CLIENT agrees to pay additional availability retainers, should the amount billable exceed the total amount paid by CLIENT for fees and costs, in the sole discretion of the ATTORNEY and/or FIRM. Work done for CLIENT prior to the execution of this Agreement will be compensated for at the standard rate of two hundred dollars ($200.00) per hour plus COSTS. The FIRM will bill all reasonable time expended by the ATTORNEY in increments of .10 of an hour, as in the ATTORNEY'S sole discretion and professional judgement, is necessary for the representation of the CLIENT in the above stated matters.

52. In summary, $5,000.00 was the minimum fee and once earned, Respondent was entitled to receive an additional $200.00/hour. To determine whether the $5000.00 had been

12

exhausted and additional amounts owed, Respondent necessarily had to keep time records calculating his hours at the rate of $200.00/hour.

53. On October 1, 2020, Deputy Bar Counsel asked Respondent to provide his time keeping entries and/or invoices by October 16, 2020. Respondent did not provide his time keeping entries until January 15, 2021. He repeatedly acknowledged that the time entries were not complete.

54. The time entries finally provided by Respondent consist of 281-line items, the vast majority of which are individually identified texts, voicemails, telephone calls, and emails received. Every item is separated, even when multiple texts, emails or voicemails occurred on the same day. Each individual item is charged at a minimum .10 of an hour ($20.00). The total number of hours expended according to Respondent was 51.90 hours.

55. Because the time compilation did not reflect the fees that were or would have been charged to Wife, Deputy Bar Counsel asked Respondent to provide the invoice he would have provided to Wife. Upon providing that document, Respondent stated:

56. Respondent later asserted he had actually "no charged" 26.80 hours and thus wrote off $5,380.00 out of the $10,380.00 owed:

> Please consider that I have not billed [Wife] for any amount above the $5,000 availability retainer she paid to me, nor have I billed her for any costs.

> As a recap, the billing document shows 31.60 hours billed at $200.00 per hour or a total amount for fees of $6,320.00 plus costs of 1,060 copies at $.15 per copy or $159.00, plus actual postage costs of $38.60. The Total Billing is $6,517.60.

> This billing includes 20.30 hours at $200.00 per hour that is shown as "NO CHARGE" or a total of $4,060.00 in fees not charged to the client in this billing. The total time expended for the representation from the time compilation provided to you last week was 51.90 hours. 20.30 No Charge hours plus 31.60 billed hours equals the total of 51.90 hours, which is the same amount as shown on the time compilation provided last week.

57.     At no point did Respondent communicate with Wife about the remaining amount of the availability retainer or tell Wife when the retainer had been exhausted.

58.     Despite Wife's requests, Respondent never provided her with an invoice.

59.     Wife finally received a copy of the invoice when Deputy Bar Counsel presented it to her on January 22, 2021.

60.     Wife identified numerous time entries with which she disagreed.   Among other things, Wife disputed charges related to text messages and emails:

> Line 66-75: April 6, 2020. Text messages that totaled $100 and mostly centered around the fact that he was currently in Tx and under a "statewide stay at home/no travel order". We talked a lot about Covid. One text message was about how he is conducting his business in Texas (appreciated) and other text about casual information pertaining to family. Once again, had I known I would had been charged $20 per text message to be "chummy", I would have elected out of this option.
>
> Line 196: 6/5/20. Another email I sent to Don, inquiring if Don had heard from Husband's attorney/ Initial Disclosure. His response, "nothing new to report". I was charged $20 for this.

61.     In response to Wife's objections, Respondent stated:

> Ten text messages, but billed for only five text messages that were sent, "NO CHARGE' [sic] for text messages sent by [Wife] to me. **The minimum time charged for the outgoing text messages is .10 per hour each which is a standard law office billing practice.** Overall, $4,060.00 of fees were shown as "NO CHARGE" and $1,517.60 above the $5,000.00 paid availability retainer has not been billed to Ms. Wife. A total of $5,577.60 of legal fees and costs is not being billed to [Wife], and have been written off.
>
> Line 196 is an email on 6/5/20 at 5:04 PM from [Wife] with a "NO CHARGE" for Read and Review email from Client. Line 197 is an email response written to Ms. Wife on 6/5/20 at 7:16 PM to Ms. Wife with **the standard minimum time charge of .10 (.10 x $200 per hour equals $20.00).** This was fully explained to [Wife] at the time she signed the Legal Services Fee Agreement, and is detailed in the written Legal Services Fee Agreement.

(emphasis added).

14

62. Respondent repeatedly charged $20.00 a piece for texts and emails containing little information or containing information unrelated to legal issues, such as information about his grandchild. Many of the texts and emails occurred on the same day, resulting in multiple charges for individual texts and emails even though the sum of the time spent responding to the emails or texts could not have been more than the amount billed for sending just one response.

63. Respondent also charged separately for listening to voicemails even when he performed other services the same day, such as speaking with the client after billing her separately ($20.00) for listening to the voicemail. On June 19, 2019, Respondent charged $80.00 for listening to a voicemail (line 19), sending two text messages stating: "So my $4000 ea plus $2000 trailer, guess was not too far off" and "Welcome" (lines 22, 27), and sending an email stating: "Thanks. Yes, I'd look at the back to see if they signed off on the title. but he has not obtained a new title." Respondent did not send the email referenced and charged in line 24.

| 06/19/19 | 9:04 | Review Voicemail Message from Client | | 0.10 | $20.00 |
|---|---|---|---|---|---|
| 06/19/19 | 9:06 | Outgoing Phone Call to Client | | 0.80 | $160.00 |
| 06/19/19 | 10:00 | Read Text Message from Client | | 0.10 | NO CHARGE |
| 06/19/19 | 10:08 | Send Text Message to Client | | 0.10 | $20.00 |
| 06/19/19 | 10:16 | Read Text Message from Client | | 0.10 | NO CHARGE |
| 06/19/19 | 10:29 | Draft and Revise Email to Client | With information on 2 jet ski Wyoming Registrations | 0.10 | $20.00 |
| 06/19/19 | 10:37 | Read and Review Email from Client | With 1 attachment (2 pages) | 0.10 | NO CHARGE |
| 06/19/19 | 11:45 | Draft and Revise Email to Client | | 0.10 | $20.00 |
| 06/19/19 | 12:44 | Send Text Message to Client | | 0.10 | $20.00 |

64. On April 4, 2020, Respondent charged $80.00 for the following services by separately charging $20.00 for each item:

15

- Reviewing a voicemail;

- Sending the following texts:
  - "[Wife]: Received your message. Can you please Scan and email me the paperwork you were served today."
  - "Welcome. Don't stress."
  - "Received. Thanks. I'll review and get back to you."

The same day, he charged $240.00 for other legal services.

65. The text messages expressly complained about by Wife dealt primarily with Respondent's family and logistics because Respondent was out of town:

66. Wife was charged $100.00 for the preceding texts and an additional $20.00 for listening to her voicemail that day.

- **Respondent:** I did get both of your emails with questions. I will respond to each. I am not able to meet with you in person today. We are still in San Antonio under a local stay at home/no travel order, and now a statewide Texas order. ($20.00)

- **Respondent:** No problem. I just didn't want you to give up a patient slot. We came down for Spring break on March 9, they extended it a week, and then cancelled schools until April 3. Now till May 4. Frontier cancelled our flight from Texas to Denver. Don't worry, we have our computers with us. We also have monitors and printer:scanner here at our sons house. All 4 of us have been working remotely from "home" ($20.00)

- **Respondent:** I did a federal criminal case last week by FaceTime. I was here in Texas, my client from jail in Wheatland, US attorney from Lander, probation Officer from Cheyenne, and Judge in Casper. ($20.00)

- **Respondent:** At least we are with our Son and his family, especially our 4 grandkids. Our premie 2 pounder grandson turned 6 yesterday. 43 pounds and 45 inches tall! Also been dealing with many client crisis daily because of COVID-19. Our youngest son is only 1 hour away with his wife and 2 kids but not been able to visit since local stay at home order first in San Antonio and next in Austin. Talk daily to our oldest daughter in Casper. Tough for all. ($20.00)

- **Respondent:** Agreed. ($20.00)

67. Respondent also billed for clerical/secretarial tasks such as preparation of transmittal letters, sending faxes, and calls to the clerk of court. Respondent charged $80.00 for drafting two transmittal letters to the clerk of court, $80.00 total for calling the clerk of court on four separate occasions, and $40.00 for sending two facsimiles. Some of these charges occurred on the same day.

68. On April 22, 2020, Respondent charged Wife $20.00 for making a phone call to the clerk of court seeking permission to fax a document, $20.00 for sending the fax to the clerk of court[2], $20.00 for calling the clerk of court to verify the fax was received, and $40.00 to "draft and revise" a transmittal letter to the clerk of court to facilitate the fax filing. The transmittal letter is a form letter. With the exception of the date and name of the document filed, the April 22, 2020, transmittal letter is identical to the April 7, 2020, transmittal letter, yet Respondent charged a total of $80.00 to "draft and revise" these letters.

**Failure to Cooperate with the Office of Bar Counsel and Immediate Suspension**

69. On October 1, 2020, Deputy Bar Counsel sent a copy of Wife's Complaint to Respondent with a letter requesting a response to the Complaint by October 16, 2020. The letter expressly requested "a copy of your entire file on the matter, including but not limited to all emails and all-time [sic] entries and/or invoices."

70. On October 16, 2020, Respondent responded to the Complaint but did not provide time entries or invoices. In his response, Respondent acknowledged that he did not provide time entries or invoices but indicated that he was "still working on" compiling the information and would "provide that as soon as it is completed."

---

[2] The next day, Respondent charged another $20.00 for sending the same facsimile to opposing counsel.

71.     On October 20, 2020, Deputy Bar Counsel requested, via email, that Respondent provide a detailed time compilation by October 30, 2020. Respondent assured Deputy Bar Counsel that he "ha[s] been working on it."

72.     On October 30, 2020, at 4:59 p.m., Respondent, via email, stated that he had not yet compiled the time.

73.     On October 31, 2020, Deputy Bar Counsel requested the information by November 6, 2020, and informed Respondent that documents responsive to the Complaint would not be reviewed until he provided the time compilation. In response, Respondent stated, "I will try my best."

74.     Nothing further was heard from Respondent.

75.     On November 17, 2020, Deputy Bar Counsel contacted Respondent via email, stating:

> On October 1, 2020, I requested a response to [Wife's] complaint by October 16. On October 16, you drove to Cheyenne to provide a large group of documents which did not contain a response to my request for all time entries. Rather, you stated that you were still working on your "detailed time compilation and will provide it as soon as it is completed". On October 20, I requested the time entries by October 30, to which you replied that you had been "working on it". On October 30, you stated you had not yet finished compiling your time but would provide it to me as soon as it is finished. I informed you that I will not review any of your materials until I have the compilation and asked you to provide it by November 6. You responded that you will try. I have heard nothing since that date.
>
> I require the time compilation by November 30, 2020. If it is not provided by that date, I will file a formal charge that includes a violation Rule 8.1(b).

76.     Respondent did not respond to this email.

77.     On December 22, 2020, Deputy Bar Counsel filed a *Petition for Immediate Suspension of Attorney* ("Petition") in the Wyoming Supreme Court ("Court") pursuant to Rule 17(a)(3), W.R.Disc.P.

18

78. In Respondent's *Answer to Petition for Immediate Suspension of Attorney*, Respondent complained:

> 4. Deputy Bar Counsel advised Respondent that if he did not provide the time compilation by the end of November, Deputy Bar Counsel would file a formal charge. Respondent understood that he would have to answer to the formal charge and subsequent proceedings, but Deputy Bar Counsel never mentioned that she would seek an immediate suspension, if she did not receive the time compilation.
>
> 5. Respondent fully intends to provide Deputy Bar Counsel with a complete time compilation, once it is completed, as he has continually advised her. However, unforseen [sic] computer hardware and software problems, unstable Internet and cell phone service have complicated the time compilation process, in addition to issues resulting from the COVID-19 pandemic, current client representations and client's needs and emergencies, and family obligations....

79. On January 13, 2021, the Court entered its *Order of Immediate Suspension* based upon Respondent's failure to cooperate with the Office of Bar Counsel. The Order directed Deputy Bar Counsel to file a Formal Charge against Respondent pursuant to Rule 17(b)(4), W.R.Disc.P.

80. A Formal Charge was filed on January 15, 2021 alleging a violation of Rule 8.1(b), W.R.Prof.Cond. (knowing failure to respond to demand for information from a disciplinary authority).

81. Respondent finally provided the time compilation via email and hard copy on January 15, 2021.

82. On February 3, 2021, the Court lifted the suspension.

83. There is clear and convincing evidence that Respondent committed the following professional misconduct:

a. Respondent violated Rule 1.2 (scope of representation and allocation of authority between client and lawyer) by failing to abide by Wife's directives to (1) exchange initial disclosures; (2) commence discovery; and (3) obtain an accounting from her husband, and/or freeze her husband's assets, despite Wife's clearly expressed

19

objectives of ascertaining assets and ensuring marital assets were disclosed and not depleted. Respondent further violated Rule 1.2 by failing to follow Wife's directives that she required information about assets and spending before proceeding to mediation because he made no effort to obtain said information.

b. Respondent violated Rule 1.3 (diligence) by failing to diligently or promptly pursue Wife's objectives and directives to obtain an accounting of assets and ensure assets were not hidden or depleted.

c. Respondent violated Rule 1.4 (communication with client) by:

   o Respondent did not communicate with Wife regarding the basis, if any, for failing to follow her directives to exchange initial disclosures, commence discovery, obtain an accounting from her husband and/or freeze her husband's assets.

   o Respondent did not consult with Wife about other avenues, if any, by which she could accomplish her objectives.

   o Respondent did not consult with Wife about possible mediation dates or the identity of the mediator for six weeks despite multiple communications with the mediator and opposing counsel.

   o Respondent did not respond to Wife's request for an invoice, accounting, or the remaining retainer.

   o Respondent did not communicate that Wife's "availability retainer" had purportedly been exhausted.

d. Respondent violated Rules 1.4 and 1.5(b) (fees) by failing to send an invoice to Wife during the fourteen months he represented her, even after expressly requested, and by

20

failing to communicate that Wife's "availability retainer" had purportedly been exhausted.

e.  Respondent violated Rule 1.5(a) (fees) by:

- o  Collecting an unreasonable fee given the amount of legal services actually performed;

- o  Failing to exercise billing judgment;

- o  Overcharging for numerous items;

- o  Charging for clerical/secretarial tasks such as preparation of transmittal letters, sending faxes, and calls to the clerk of court; and

- o  Refusing to return any portion of the $5,000.00 "availability retainer" despite not earning all of the funds.

f.  Respondent violated Rule 3.2 (expediting litigation) by failing to expedite the litigation consistent with the interests of his client.

g.  Respondent violated Rule 3.4 (fairness to opposing party and counsel) by failing to timely respond to inquiries about mediation dates or communicate with opposing counsel regarding the basis, if any, for the delay in setting mediation. Pursuant to Rule 801(a)(3) and (5) of the Uniform Rules for District Courts of the State of Wyoming, Respondent had a duty to cooperate with opposing counsel. Respondent's failure to communicate or cooperate with opposing counsel violated Rule 801(a)(3) and (5), which in turn violated W.R.P.C. 3.4(c) (compliance with the rules of the tribunal).

h.  Respondent violated Rule 8.1(b) (cooperation with disciplinary matters) by failing to provide information and documents requested by the OBC and failing to respond to requests altogether.

21

84. In committing the foregoing misconduct, Respondent violated duties owed to his client (ABA Standards 4.4, 4.6 and 7.0) and to opposing party and counsel (ABA Standard 6.2). Under the preceding Standards, suspension is the presumptive sanction for Respondent's misconduct. Respondent knowingly failed to perform services as directed by Wife and caused serious or potentially serious injury to Wife. Respondent knowingly caused serious or potentially serious injury to Wife by overcharging for numerous items, failed to exercise billing judgment, and charging Wife at Respondent's billing rate for clerical/secretarial tasks such as preparation of transmittal letters, sending faxes, and calls to the clerk of court. Respondent failed to timely respond to inquiries about mediation dates or communicate with opposing counsel regarding the basis, if any, for the delay in setting mediation, in willful violation of a court order and in violation of Rule 801(a)(3) and (5) of the Uniform Rules for District Courts of the State of Wyoming.

85. The facts of Respondent's violation of Rule 8.1(b) (bar admission and disciplinary matters) does not fall squarely within an ABA Standard.

86. The following aggravating factors are present: (1) prior disciplinary record; (2) pattern of misconduct; (3) multiple offenses; (4) bad faith obstruction of the disciplinary proceeding by intentionally failing to cooperate with the OBC's investigation; (5) submission of false evidence, false statements, or other deceptive practices during the disciplinary process; (6) refusal to acknowledge wrongful nature of conduct; and (7) substantial experience in the practice of law.

87. No mitigating factors exist.

88. Respondent's willingness to stipulate to restitution is neither aggravating nor mitigating as Respondent was indifferent to making restitution but eventually agreed to do so.

22

89.    In consideration of the foregoing factors and misconduct by Respondent, the appropriate sanction is a three-year suspension.

90.    If the Court adopts the Review Panel's recommendation and issues an Order of Suspension in accordance herewith, the parties have agreed to the following press release:

The Wyoming Supreme Court issued an order of a three-year suspension to Casper attorney Donald L. Tolin. In 2019, Wife hired Tolin to represent her in a divorce proceeding and paid Tolin a non-refundable "availability retainer" of $5,000.00. The "availability retainer" was not a flat fee; Tolin's representation agreement stated that Wife was responsible for fees incurred after the $5,000.00 was exhausted. Wife's husband filed for divorce in April 2020. From June 2019 – August 10, 2020, Wife expressed repeated requests that marital assets should be preserved and expressed concerns about the depletion of marital assets by Husband. After the divorce complaint was filed, Wife immediately began requesting a full accounting of Husband's assets. She repeatedly asked Tolin about the status of initial disclosures and emphasized the importance of receiving Husband's initial disclosures and beginning the discovery process based upon her fears that Husband was improperly utilizing and hiding marital assets. Initial disclosures were due in May 2020, and although the deadline may be extended by agreement of the parties, Wife required the commencement of the discovery process. Tolin's representation was terminated on August 18, 2020. Despite Wife's repeated directives to exchange initial disclosures and commence discovery, Tolin never did so. Despite expressing fears since June 2019 that her husband was hiding assets and demanding a full accounting, Tolin never requested an accounting from Wife's husband.

In June 2020, the District Court ordered a mediation prior to setting a trial as requested by Husband. Between July 2 and August 10, 2020, the mediator proposed twenty-eight possible mediation dates spanning from August 25 through October 30, 2020, most of which were agreed upon by opposing counsel. Tolin did not respond timely to several requests and stated he was unavailable for all dates, prompting communications and concerns from Husband's attorney and the mediator regarding the delay in resolving the matter since a trial could not occur until the court-ordered mediation took place. Tolin did not communicate with Wife about any proposed dates nor notify her of the identity of the mediator until August 10, 2020, at which time, he learned that Wife had a conflict with the proposed mediator.

As soon as Tolin's representation was terminated, Wife thrice requested invoices reflecting the time spent on the case and requested a refund of funds not utilized, which she never received. During the fourteen months Tolin represented Wife, he never sent an invoice, even after expressly requested, and did not communicate that Wife's "availability retainer" had purportedly been exhausted.

23

In October 2020, the Office of Bar Counsel ("OBC") commenced an investigation into Wife's complaint. Between October 1 – November 17, 2020, the OBC requested Tolin's time compilation and invoices on four occasions. Tolin did not provide the compilation or request extensions of time to provide the compilation. Tolin did not respond to the OBC's last inquiry despite the OBC's warning that failing to comply would result in a Formal Charge alleging violations of Rule 8.1(b). On January 13, 2021, the Wyoming Supreme Court entered an *Order of Immediate Suspension* based upon Tolin's failure to cooperate with the OBC.

After the suspension, Tolin provided a time compilation and invoice to the OBC. The invoices reflect that that he repeatedly charged $20.00 for texts and emails containing little information or containing information unrelated to legal issues, such as information about Tolin's grandchild. Many of the texts and emails occurred on the same day, resulting in multiple charges for individual texts and emails even though the sum of the time spent responding to the emails or texts was not more than the amount billed for sending just one response. Tolin also charged separately for listening to voicemails even when performing other services the same day, such as speaking with Wife after billing her $20.00 separately for listening to the voicemail. In addition, on April 4, 2020, Tolin charged $80.00 for the following services by separately charging $20.00 for each item:

o Reviewing a voicemail;
o Sending the following texts:
  ▪ "[Wife]: Received your message. Can you please Scan and email me the paperwork you were served today."
  ▪ "Welcome. Don't stress."
  ▪ "Received. Thanks. I'll review and get back to you."

Tolin charged $240.00 for other legal services on the same day. Tolin also billed his hourly rate for clerical/secretarial tasks such as preparation of transmittal letters, sending faxes, and calls to the clerk of court.

Tolin admitted that his conduct violated numerous Rules of Professional Conduct. He admitted violating Rule 1.2 (scope of representation and allocation of authority between client and lawyer) by failing to comply with his client's directives. He violated Rule 1.3 (diligence) and Rule 3.2 (expediting litigation) by neglecting the case for several months. He violated Rule 1.4 (communication with client) by failing to respond to numerous inquiries from his client. Tolin further conceded violations of Rule 1.5 (fees) by failing to exercise professional billing judgment and excessive charges, including charging for clerical tasks at his lawyer hourly rate. Tolin violated Rule 3.4(c) (duty to abide by the rules of the tribunal) by willfully violating a court order for mediation of the case. Tolin's conduct also violated Rule 801(a)(3) and (5) (standards of professional behavior) of the Uniform Rules for District Courts of the State of Wyoming. Tolin further admitted that his failure to cooperate with the disciplinary investigation violated Rule 8.1. In

24

approving the recommendation of the Board of Professional Conduct's recommendation of a three-year suspension as the appropriate sanction for Tolin's conduct, the Court ordered Tolin to pay administrative fees in the amount of $750.00 and costs of $50.00 to the Wyoming State Bar. Tolin was also required to refund $1500.00 to Wife.

## CONCLUSIONS OF LAW

91.    Rule 1.2, W.R.Prof.Cond., provides in pertinent part:

(a) Subject to paragraphs (c), (d), and (e), a lawyer shall abide by a client's decisions concerning the objectives of representation, and, as required by Rule 1.4, shall consult with the client as to the means by which they are to be pursued. A lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation. A lawyer shall abide by a client's decision whether to settle a matter. In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify.

92.    Rule 1.3, W.R.Prof.Cond., provides, "A lawyer shall act with reasonable diligence and promptness in representing a client.

93.    Rule 1.4, W.R.Prof.Cond., provides in pertinent part:

(a) A lawyer shall:

(1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in 1.0(f), is required by these Rules;
(2) reasonably consult with the client about the means by which the client's objectives are to be accomplished;
(3) keep the client reasonably informed about the status of the matter;
(4) promptly comply with reasonable requests for information; and
(5) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Rules of Professional Conduct or other law.

94.    Rule 1.5, W.R.Prof.Cond., provides in pertinent part:

(a) A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal

25

service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

(b) The scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation, except when the lawyer will charge a regularly represented client on the same basis or rate. Contingent fee agreements must be in writing and must comply with the provisions of the Rules Governing Contingent Fees for Members of the Wyoming State Bar. Any changes in the basis or rate of the fee or expenses shall also be communicated to the client.

95. Rule 3.2, W.R.Prof.Cond., provides, "A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client."

96. Rule 3.4, W.R.Prof.Cond., provides in pertinent part, "A lawyer shall not…knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists."

97. Rule 801(a)(3) and (5) of the Uniform Rules for District Courts of the State of Wyoming states in pertinent part:

Standards of professional behavior.

As one of the learned professions, the practice of law is founded upon principles of fairness, decency, integrity and honor. Professionalism connotes adherence by attorneys in their relations with judges, colleagues, litigants, witnesses and the public to appropriate standards of behavior. The district courts of Wyoming, in furtherance of the inherent power and responsibility of courts to supervise proceedings before them, shall hold attorneys to the following standards of professional behavior:

(a) Standards of Behavior in Adjudicative Proceedings.

(3) Attorneys shall at all times extend reasonable cooperation to opposing counsel. Attorneys shall not arbitrarily or unreasonably withhold consent to opposing counsel's requests for reasonable scheduling or logistical accommodations, nor shall they condition their cooperation on disproportionate or unreasonable demands.

(5) Attorneys shall be reasonably punctual in their communications with all persons involved in the adjudicative process and shall appear on time for all duly scheduled events involved in the adjudicative process, unless excused or detained by circumstances beyond their reasonable control. When an attorney, or an attorney's client, or a witness under the reasonable control of an attorney, becomes unavailable for a duly scheduled event, then the attorney shall promptly notify opposing counsel and, where appropriate, court reporters, court personnel, and others involved in the event.

98. Rule 8.1, W.R.Prof.Cond., provides, "An applicant for admission to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not: (a) knowingly make a false statement of material fact; or (b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority, except that this rule does not require disclosure of information otherwise protected by Rule 1.6."

27

99.    Rule 8.4, W.R.Prof.Cond., provides in pertinent part:

It is professional misconduct for a lawyer to:
   ***
      (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;
      (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
      (d) engage in conduct that is prejudicial to the administration of justice ***

100.    Rule 15(b)(3)(D), W.R.Disc.P., provides, "In imposing a sanction after a finding of misconduct by the respondent, the BPR shall consider the following factors, as enumerated in the ABA Standards for Imposing Lawyer Sanctions:"

   1.    Whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession;
   2.    Whether the lawyer acted intentionally, knowingly, or negligently;
   3.    The amount of the actual or potential injury caused by the lawyer's misconduct; and
   4.    The existence of any aggravating or mitigating factors.

101.    Standard 4.4, "Lack of Diligence," of the ABA Standards for Imposing Lawyer Sanctions sets forth the following guidelines:

   Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving a failure to act with reasonable diligence and promptness in representing a client:

4.41    Disbarment is generally appropriate when:
   (a) a lawyer abandons the practice and causes serious or potentially serious injury to a client; or
   (b) a lawyer knowingly fails to perform services for a client and cause serious or potentially serious injury to a client; or
   (c) a lawyer engages in a pattern of neglect with respect to client matters and causes serious or potentially serious injury to a client.
4.42    Suspension is generally appropriate when:
   (a) a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client, or
   (b) a lawyer engages in a pattern of neglect with respect to client matters and causes injury or potential injury to a client.
4.43    Reprimand [i.e., "public censure" under Rule 9(a)(3) of the Rules of Disciplinary Procedure] is generally appropriate when a lawyer is negligent

28

and does not act with reasonable diligence in representing a client, and causes injury or potential injury to a client.

4.44 Admonition [i.e., "private reprimand" under Rule 9(a)(4) of the Rules of Disciplinary Procedure] is generally appropriate when a lawyer is negligent and does not act with reasonable diligence in representing a client, and causes little or no actual or potential injury to a client.

102. ABA Standard 4.6, "Lack of Candor," provides:

Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving a failure to act with reasonable diligence and promptness in representing a client:

4.41 Disbarment is generally appropriate when:
(a) a lawyer abandons the practice and causes serious or potentially serious injury to a client; or
(b) a lawyer knowingly fails to perform services for a client and cause serious or potentially serious injury to a client; or
(c) a lawyer engages in a pattern of neglect with respect to client matters and causes serious or potentially serious injury to a client.

4.42 Suspension is generally appropriate when:
(a) a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client, or
(b) a lawyer engages in a pattern of neglect with respect to client matters and causes injury or potential injury to a client.

4.43 Reprimand [i.e., "public censure" under Rule 9(a)(3) of the Rules of Disciplinary Procedure] is generally appropriate when a lawyer is negligent and does not act with reasonable diligence in representing a client, and causes injury or potential injury to a client.

4.44 Admonition [i.e., "private reprimand" under Rule 9(a)(4) of the Rules of Disciplinary Procedure] is generally appropriate when a lawyer is negligent and does not act with reasonable diligence in representing a client, and causes little or no actual or potential injury to a client.

103. ABA Standard 6.2, "Abuse of Legal Process," provides:

ABA Standard 6.2 provides:

Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving failure to expedite litigation or bring a meritorious claim, or failure to obey any obligation under the rules of the tribunal except for an open refusal based on an assertion that no valid obligation exists:

6.21 Disbarment is generally appropriate when a lawyer knowingly violates a court order or a rule with the intent to obtain a benefit for the lawyer or

29

another, and causes serious or potentially serious injury to a party or causes serious or potentially serious interference with a legal proceeding.

6.22    Suspension is generally appropriate when a lawyer knows that he or she is violating a court order or rule, and causes injury or potential injury to a client or a party, or causes interference or potential interference with a legal proceeding.

6.23    Reprimand [i.e., "public censure" under Rule 9(a)(3) of the Rules of Disciplinary Procedure] is generally appropriate when a lawyer negligently fails to comply with a court order or rule, and causes injury or potential injury to a client or other party, or causes interference or potential interference with a legal proceeding.

6.24    Admonition [i.e., "private reprimand" under Rule 9(a)(4) of the Rules of Disciplinary Procedure] is generally appropriate when a lawyer engages in an isolated instance of negligence in complying with a court order or rule, and causes little or no actual or potential injury to a party, or causes little or no actual or potential interference with a legal proceeding.

104.    ABA Standard 7.0, "Violations of Other Duties Owed as a Professional," provides:

Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving false or misleading communication about the lawyer or the lawyer's services, improper communication of fields of practice, improper solicitation of professional employment from a prospective client, unreasonable or improper fees, unauthorized practice of law, improper withdrawal from misrepresentation, or failure to report professional misconduct.

7.1    Disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public or the legal system.

7.2    Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury to a client, the public, or the legal system.

7.3    Reprimand [i.e., "public censure" under Rule 9(a)(3) of the Rules of Disciplinary Procedure] is generally appropriate when a lawyer negligently engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury to a client, the public, or the legal system.

7.4.    Admonition [i.e., "private reprimand" under Rule 9(a)(4) of the Rules of Disciplinary Procedure] is generally appropriate when a lawyer engages in an isolated instance of negligence that is a violation of a duty owed as a professional, and causes little or no actual or potential injury to a client, the public, or the legal system.

105.    The Preface to the ABA Standards includes the following discussion regarding mental state:

30

The mental states used in this model are defined as follows. The most culpable mental state is that of intent, when the lawyer acts with the conscious objective or purpose to accomplish a particular result. The next most culpable mental state is that of knowledge, when the lawyer acts with conscious awareness of the nature or attendant circumstances of his or her conduct both without the conscious objective or purpose to accomplish a particular result. The least culpable mental state is negligence, when a lawyer fails to be aware of a substantial risk that circumstances exist or that a result will follow, which failure is a deviation of a care that a reasonable lawyer would exercise in the situation.

106.    Under the ABA Standards, "injury" is defined as "harm to a client, the public, the legal system, or the profession which results from a lawyer's misconduct. The level of injury can range from 'serious' injury to 'little or no' injury; a reference to 'injury' alone indicates any level of injury greater than 'little or no' injury." "Potential injury" is defined as "harm to a client, the public, the legal system or the profession that is reasonably foreseeable at the time of the lawyer's misconduct, and which, but for some intervening factor or event, would probably have resulted from the lawyer's misconduct."

107.    ABA Standard 9.0, entitled "Aggravation and Mitigation," provides as follows:

9.1    *Generally*
After misconduct has been established, aggravating and mitigating circumstances may be considered in deciding what sanction to impose.
9.2    *Aggravation*
9.21    *Definition.* Aggravation or aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed.
9.22    *Factors which may be considered in aggravation.* Aggravating factors include:
(a) prior disciplinary offenses;
(b) dishonest or selfish motive;
(c) a pattern of misconduct;
(d) multiple offenses;
(e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency;
(f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;
(g) refusal to acknowledge wrongful nature of conduct;
(h) vulnerability of the victim;
(i) substantial experience in the practice of law;
(j) indifference in making restitution; and
(k) illegal conduct, including that involving the use of controlled substances.

31

9.3     *Mitigation.*

9.31    *Definition.* Mitigation or mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed.

9.32    *Factors which may be considered in mitigation.* Mitigating factors include:
(a) absence of a prior disciplinary record;
(b) absence of a dishonest or selfish motive;
(c) personal or emotional problems;
(d) timely good faith effort to make restitution or to rectify consequences of misconduct;
(e) full and free disclosure of disciplinary board or cooperative attitude toward proceedings;
(f) inexperience in the practice of law;
(g) character or reputation;
(h) physical disability;
(i) mental disability or chemical dependency including alcoholism or drug abuse when:
(1) there is medical evidence that the respondent is affected by a chemical dependency or mental disability;
(2) the chemical dependency or mental disability caused the misconduct;
(3) the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and
(4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely.
(j) delay in disciplinary proceedings;
(k) imposition of other penalties or sanctions;
(l) remorse; and
(m) remoteness of prior offenses.

9.4     *Factors Which Are Neither Aggravating nor Mitigating.*
The following factors should not be considered as either aggravating nor mitigating:
(a) forced of compelled restitution;
(b) agreeing to the client's demand for certain improper behavior or result;
(c) withdrawal of complaint against the lawyer;
(d) resignation prior to completion of disciplinary proceedings;
(e) complainant's recommendation as to sanction; and
(f) failure if injured client to complain.

## RECOMMENDATION

In consideration of the foregoing findings of fact and conclusions of law, the Review Panel recommends as follows:

1.      That Respondent be suspended for three years for violations of Rules 1.2, 1.3, 1.4, 1.5, 3.2, 3.4, and 8.1, W.R.Prof.Cond.

2. That the suspension commence on January 1, 2022.

3. That, upon issuance of the order of suspension, the foregoing press release may be issued.

4. That Respondent be required to pay an administrative fee of $750.00 and costs of $50.00 to the Wyoming State Bar within 10 days of such order.

Dated this 22 day of November, 2021.

Debra J. Wendtland, Chair
Review Panel of the Board of Professional
Responsibility
Wyoming State Bar

33