# THE SUPREME COURT, STATE OF WYOMING

## 2025 WY 55

APRIL TERM, A.D. 2025

May 21, 2025

BOARD OF PROFESSIONAL
RESPONSIBILITY, WYOMING STATE
BAR,

Petitioner,

v.

D-25-0001

LETITIA C. ABROMATS, WSB #7-5262,

Respondent.

*Original Proceeding for Attorney Discipline*

*Representing Petitioner:*
    Mark W. Gifford, Bar Counsel, Wyoming State Bar.

*Representing Respondent:*
    Letitia Abromats, pro se.

*Before FOX, C.J., and BOOMGAARDEN, GRAY, FENN, and JAROSH, JJ.*

NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**FENN, Justice.**


## ORDER OF PUBLIC CENSURE

[¶1]   The Wyoming State Bar (Bar) charged attorney Letitia C. Abromats with violations of Rules 1.3 and 1.4(b) of the Wyoming Rules of Professional Conduct for Attorneys at Law (W.R.P.C).   After a hearing on these two charges, the Board of Professional Responsibility (BPR) submitted its Report and Recommendation for a public censure of Ms. Abromats.  Ms. Abromats objects to the BPR's report and the proposed public censure. We have reviewed the Report and Recommendation and Ms. Abromats's objection to it. Having performed an independent and thorough review of the record, we conclude Ms. Abromats violated Rules 1.3 and 1.4(b) and accept the BPR's recommendation that Ms. Abromats be publicly censured and pay the costs incurred by the BPR.

## ISSUES

[¶2]   The issues are:

>   I.   Does the record contain clear and convincing evidence Ms. Abromats violated W.R.P.C. 1.3?
>
>   II.   Does the record contain clear and convincing evidence Ms. Abromats violated W.R.P.C. 1.4(b)?
>
>   III.   If the charges are supported by clear and convincing evidence, is public censure the appropriate sanction under Wyoming Rules of Disciplinary Procedure (W.R.D.P.) 15(b)(3)(D)?

## STATEMENT OF THE CASE

**Ms. Abromats's Representation of the Ellerbee Heirs**

[¶3]   Curt Ellerbee and his co-heirs, Rebel Ellerbee, Kimberley Kaiser, and Kimberly Winn (collectively the Ellerbee Heirs), inherited certain properties in Basin, Wyoming, from John Ellerbee.[1]   During his lifetime, John entered into agreements to sell these properties to their respective occupants.  Ms. Abromats's representation of the Ellerbee Heirs in the enforcement of these agreements forms the center of this disciplinary matter.

---

[1] Because many of the parties have the same last name, we will refer to Curt and John by their first names for clarity.

[¶4]    One of the inherited properties was occupied by the Tepperts.  The other property consisted of two parcels: 602 S. 5th Street (Parcel Two) and 604 S. 5th Street (Parcel One).[2] Parcels One and Two were occupied by Curt and Nicole Earl (the Earls).  Both the Tepperts and the Earls were in default on their loans from John.  In March 2022, Curt contacted Ms. Abromats to initiate forcible entry and detainer actions against the Tepperts and the Earls.

[¶5]    Curt sent Ms. Abromats two emails containing electronic documents regarding the sale of Parcels One and Two to the Earls.  The documents attached to the first email included: an escrow agreement designating Security State Bank as the escrow agent; a Warranty Deed dated May 29, 2012, conveying Parcel Two from John to the Earls; and a Mortgage given to John by the Earls to secure their monthly payment obligation.

[¶6]    The 2012 Warranty Deed and the Mortgage for Parcel Two were recorded with the Big Horn County Clerk on May 30, 2012.  The escrow agreement referenced a quitclaim deed, but it had been crossed out, marked "NA" and initialed.  A crossed out copy of the quitclaim deed was also included in Curt's email to Ms. Abromats.  Curt's email informed Ms. Abromats that the Big Horn County Assessor's office told him the Earls were the owners of Parcel Two despite the unpaid loan and delinquent taxes.

[¶7]    The documents attached to Curt's second email contained information pertaining to a 2015 "refinance" of the Mortgage on Parcel Two and the "sale" of Parcel One to the Earls (2015 Transaction).  These documents included an Agreement for Warranty Deed, which indicated the Ellerbee Heirs and the Earls "agreed to refinance" the Mortgage on Parcel Two "in escrow #134 at Security State Bank," and combine it with an additional $10,000 to purchase Parcel One.  This document also stated if the Earls repaid the loan, the Ellerbee Heirs would file a Warranty Deed for Parcel One and a Release of the Mortgage for Parcel Two.  The parties also agreed to place a quitclaim deed for both parcels into escrow in the event the Earls defaulted on the loan.  If the Earls defaulted, the Ellerbee Heirs had the "option" to declare the agreement forfeited and retake possession of both parcels.  This option was "cumulative and in addition to any other remedies which [the Ellerbee Heirs] may have either under this contract, at law, or in equity."  Curt's second email also attached copies of an escrow agreement, an executed but unrecorded Release of Mortgage for Parcel Two, an executed but unrecorded Warranty Deed for Parcel One, a promissory note, a Memorandum of Agreement, and an unrecorded quitclaim deed for both parcels.

[¶8]    After reviewing the documents emailed by Curt, Ms. Abromats concluded it would be necessary to initiate foreclosure proceedings against the Earls instead of a forcible entry and detainer action.  On May 3, 2022, the Ellerbee Heirs electronically signed a fee agreement, which indicated the "Scope of Services" was "Foreclosure on two separate

---

[2] At the disciplinary hearing, the parties referred to Parcel One as "Lot 2" and Parcel Two as "Lot 1."

cases: Earl and Teppert."[3]  They paid a "flat rate" of $2,000, $1,000 of which pertained to the case against the Earls.

[¶9]    On May 10, 2022, Ms. Abromats informed Curt two judgment liens had been filed against Parcel Two with the Big Horn County Clerk by Collection Professionals, Inc. Ms. Abromats advised Curt:

> There are two liens on the Earl property. See attached. From reviewing the documents, I think we can just record the quitclaim without a sheriff's sale due to the agreements of the parties. However, the lien[s] will continue to accrue post judgment interest at 10% per year. Currently, between both liens, the total is over $8787.54.

Ms. Abromats did not check to see if any other liens had been filed against the Earls that might have attached to Parcel Two.  Had she done so, she would have discovered two other judgment liens had been recorded: 1) a judgment in the amount of $23,233.72 in favor of Chetan Patel, d/b/a One Stop (Patel lien); and 2) a lien in the amount of $4,909.98 in favor of Rocky Mountain Recovery Systems, Inc. (Rocky Mountain lien).  The Patel lien arose from a 2009 default judgment against the Earls and a 2018 order reviving that judgment. Ms. Abromats represented Mr. Patel in that revival action.  Had Ms. Abromats searched for liens against the Earls, she would have discovered she had a clear conflict of interest between Mr. Patel collecting his judgment and the Ellerbee Heirs extinguishing any junior liens on Parcel Two.

[¶10]  Curt contacted Ms. Abromats about the Collections Professionals liens on May 26, 2022.  He asked her what they were for and if they would transfer to him and the other heirs.  Ms. Abromats informed Curt she would have to research this issue, but she believed the liens ran with the property.

[¶11]  On July 8, 2022, without discussing any other possible options with Curt, Ms. Abromats filed the quitclaim deed for both parcels.  After she recorded the quitclaim deed, she emailed Curt and suggested he contact Collections Professionals to see if he could settle the liens for "pennies on the dollars."  Curt was able to get Collections Professionals to remove its liens without any payment.  After she filed the quitclaim deed, Ms. Abromats served the Earls with a three-day notice to quit, and they voluntarily left the property.

[¶12]  On August 19, 2022, Curt contacted Ms. Abromats for assistance in getting the Patel and Rocky Mountain liens removed because they were preventing the sale of Parcel Two. On November 8, 2022, Curt contacted Ms. Abromats again and asked her to refund the

---

[3] The foreclosure proceedings against the Tepperts are not part of the disciplinary complaint against Ms. Abromats.

$2,000 fee. Ms. Abromats responded three days later. She informed Curt she had to withdraw from all further representation due to a conflict of interest. She also informed Curt, in relevant part:

> Good afternoon. Since our phone conversation, I had a chance to go back and review your file.
>
> 1. Initially you contacted me to do a forcible entry and detainer action. Upon receipt of documents from you, it appeared that there was a contract for deed and that Security State Bank was the trustee. Those arrangements require a foreclosure. I communicated that to you and then we began the legal representation.
> 2. Upon further evaluation of the documents provided to me, it became apparent that this was not a contract for deed but was an unusual case where although the grantor provided a warranty deed, a mortgage, and a promissory note was signed, he then took back a quitclaim deed.[4] What that meant was that the Earls held an equitable interest in the property and that [John] held the legal interest. A foreclosure was not appropriate.
> 3. That is why I located the quitclaim deeds with some effort and had them recorded, then began a forcible entry and detainer action. This was AFTER I sent the mandatory letters per the agreement made by [John] and the Earls.
> 4. Because the Earls only had an equitable interest in the property, there cannot be an enforceable judgment lien on the property. *See In re estate of Ventling*, 771 P.2d 388 (Wyo. 1989).
> 5. If the Earls had a warranty deed and [John] had a mortgage (both of which became a nullity after he took back the quitclaim deed), a foreclosure would have been necessary and both of the judgment liens would have been enforceable.
> 6. According to the title company, both issues that are holding up the sale of your property are judgment liens. Accordingly, neither one is enforceable.
> 7. After discovery that Mr. Patel had one of the liens, I immediately called the State Bar and was advised by

---

[4] At the hearing, Ms. Abromats stated she was referring to the 2012 Quitclaim Deed that had been crossed out and never recorded. She admitted this statement was incorrect, and she asserted it was the 2015 Transaction that gave the Earls an equitable interest in Parcel Two.

[Bar Counsel] that I could only move forward if both you and Mr. Patel signed [a] waiver of the conflict.

8. For that reason, I have not done anything else with this case.

9. I am not going to refund your money, as I fully earned that fee.

10. If you want me to do more work for you, then I will need to be paid by the hour, which is $200 per hour.

11. The only remedy at this time, in my opinion, is to have a declaratory judgment as to the validity of the liens on your property.

[¶13]   After receiving this email, Curt reached out to the title company, telling them Ms. Abromats claimed the Patel and Rocky Mountain liens were unenforceable.  In response, the title company concluded the Earls had a fee simple interest in Parcel Two, and the Patel and Rocky Mountain liens attached to that property.  The title company opined Ms. Abromats should have foreclosed on Parcel Two rather than filing the quitclaim deed.  The Ellerbee Heirs paid more than $13,000 out of the proceeds from the sale of Parcel Two to satisfy the Patel and Rocky Mountain liens.

**Disciplinary Proceeding**

[¶14]   Bar Counsel investigated a complaint regarding Ms. Abromats's conduct in this matter.  On March 28, 2024, the Review and Oversight Committee authorized Bar Counsel to bring a formal charge against Ms. Abromats.  Bar Counsel charged Ms. Abromats with violations of W.P.R.C. 1.3 (Diligence) and 1.4(b) (Communication).  Following a hearing, the BPR determined Ms. Abromats violated W.R.P.C. 1.3 and 1.4(b) and recommended a public censure.  Ms. Abromats objects to the Report and Recommendation, arguing the BPR's findings were based on an incorrect interpretation of the underlying property law.

## STANDARD OF REVIEW

[¶15] "This Court is charged with establishing the 'practice and procedure for disciplining, suspending, and disbarring attorneys.'" *Bd. of Pro. Resp., Wyo. State Bar v. Austin*, 2023 WY 110, ¶ 10, 538 P.3d 653, 658 (Wyo. 2023) (quoting *Bd. of Pro. Resp., Wyo. State Bar v. Hinckley*, 2022 WY 18, ¶ 2, 503 P.3d 584, 592 (Wyo. 2022)).  Although we give due consideration to the findings, recommendations, and credibility determinations of the Hearing Panel, the ultimate judgment in proceedings under the Wyoming Rules of Disciplinary Procedure is vested in this Court. *Id.* (quoting *Hinckley*, ¶ 4, 503 P.3d at 593). We examine the evidence, make findings, determine whether there has been an infraction of the Wyoming Rules of Professional Conduct, and impose the discipline this Court considers appropriate. *Id.*   "We conduct a de novo review of all aspects of attorney

5

discipline." *Richard v. Bd. of Pro. Resp., Wyo. State Bar*, 2024 WY 46, ¶ 14, 547 P.3d 309, 314 (Wyo. 2024) (citing *Austin*, 2023 WY 110, ¶ 10, 538 P.3d at 658).

[¶16] "Our review is limited to the formal charge and those charges where an attorney was provided notice of the facts, the alleged misconduct, and rules violated." *Austin*, ¶ 11, 538 P.3d at 658 (citing *Hinckley*, ¶¶ 7–9, 503 P.3d at 594–95; W.R.D.P. 13(a)). A formal charge must set forth clearly and with particularity the grounds for discipline and the conduct that gave rise to the charges. W.R.D.P. 13(a). Bar counsel must prove an alleged violation of the Rules by clear and convincing evidence. *Austin*, ¶ 11, 538 P.3d at 658 (citing W.R.D.P. 15(b)). "Clear and convincing evidence is 'that kind of proof that would persuade a trier of fact that the truth of the contention is highly probable.'" *Id.* (citing *Bd. of Pro. Resp., Wyo. State Bar v. Stinson*, 2014 WY 134, ¶ 29, 337 P.3d 401, 409 (Wyo. 2014)). "Our review is conducted with a focus on 'safeguarding the interests of the public, the courts, and the legal profession.'" *Id.* (quoting *Hinckley*, ¶ 3, 503 P.3d at 593).

## DISCUSSION OF THE CHARGES

[¶17] We note the parties' briefing invites this Court to interpret the documents involved in the 2015 Transaction and decide whether a foreclosure or filing the quitclaim deed was the proper course of action. We decline to do so. The issue in this case is whether Ms. Abromats violated the Wyoming Rules of Professional Conduct. Our focus is on whether Ms. Abromats's representation of the Ellerbee Heirs satisfied her ethical obligations. We begin with a review of the record to see if it contains clear and convincing evidence establishing Ms. Abromats violated W.R.P.C. 1.3 and 1.4(b). We then turn to the appropriateness of the recommended sanction.

### I. Does the record contain clear and convincing evidence Ms. Abromats violated W.R.P.C. 1.3?

[¶18] The Bar charged Ms. Abromats with a violation of her duty of diligence under W.R.P.C. 1.3. which states: "A lawyer shall act with reasonable diligence and promptness in representing a client." The comments to this rule state:

> A lawyer should pursue a matter on behalf of a client despite opposition, obstruction or personal inconvenience to the lawyer, and take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor. A lawyer must also act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf.

W.R.P.C. 1.3 cmt. 1. This rule is aimed at preventing procrastination, unreasonable delay in handling a case, and neglect of client matters. W.R.P.C. 1.3 cmts. 3, 5. However, "[l]ack of diligence can take a variety of forms." *ABA Annotated Standards for Imposing Lawyer*

6

*Sanctions*, Standard 4.4 at 194 (Ellyn S. Rosen ed., 2nd ed. 2019) (ABA Standards). An attorney can violate Rule 1.3 through inadequate investigation and preparation. Ann. Model Rules of Pro. Conduct r. 1.3 cmt. (Am. Bar. Ass'n 2023). To devote reasonable diligence to a matter, "[t]he lawyer must perform tasks reasonably appropriate to the representation, including, where appropriate, inquiry into facts, analysis of law, exercise of professional judgment, communication with the client, rendering of practical and ethical advice, and drafting of documents." Restatement (Third) of the Law Governing Lawyers § 52 cmt. c (Oct. 2024 Update). "[T]he obligation to diligently pursue a client's interests is one of the 'most important ethical duties [] a lawyer owes to the client.'" ABA Standards 4.4 at 194 (quoting *In re Conduct of Sousa*, 915 P.2d 408, 413 (Or. 1996)).

[¶19] We have found violations of W.R.P.C. 1.3 in a variety of circumstances. Most of our previous cases involving violations of Rule 1.3 encompass situations where an attorney failed to timely file pleadings in an action, failed to respond to repeated inquiries from a client, or failed to timely pursue the client's objectives or directives. *See, e.g.*, *Bd. of Pro. Resp., Wyo. State Bar v. Beduhn*, 2024 WY 76, ¶ 52, 552 P.3d 371, 380 (Wyo. 2024) (finding an attorney violated Rule 1.3 by failing to participate in a lawsuit at any point after filing the initial complaint); *Bd. of Pro. Resp., Wyo. State Bar v. Craven*, 2023 WY 17, ¶ 15, 524 P.3d 220, 224 (Wyo. 2023) (finding an attorney violated Rule 1.3 by failing to file a divorce complaint despite repeated inquiries from the client); *Bd. of Pro. Resp., Wyo. State Bar v. Tolin*, 2022 WY 1, 501 P.3d 1232, 1245 (Wyo. 2022) (finding an attorney violated Rule 1.3 by failing to pursue his client's objective and directives to obtain an accounting and ensure assets were not hidden or depleted). At least two of our previous cases involved allegations of inadequate investigation and preparation. *Bd. of Pro. Resp., Wyo. State Bar v. Crawford-Fink*, 2018 WY 130, ¶ 24, 430 P.3d 323, 332 (Wyo. 2018) (finding an attorney violated Rule 1.3 by failing to obtain complete information about the parties' assets and liabilities prior to the default hearing, failing to meet with her client to discuss what information would be required for the hearing so the client could obtain that information, preparing a decree that contained erroneous information, and failing to act with reasonable diligence to correct those errors and get the matter concluded); *Hinckley*, 2022 WY 18, ¶¶ 25–26, 80, 503 P.3d at 599, 613 (finding a prosecutor violated Rule 1.3 when he failed to adequately investigate the availability of a witness's social media and cellphone records before making representations to the trial court about what he was doing to obtain those records).

[¶20] The BPR determined Ms. Abromats violated W.R.P.C. 1.3 in the following ways:

> a. Failing to recognize that the recorded deed for [Parcel Two] vested legal fee title in the Earls.

> b. Failing to determine if there were other judgment liens against the Earls upon discovery of the Collection Professionals, Inc., judgment liens.

> c.     Failing to foreclose on [Parcel Two], which was the scope of [her] engagement by the Ellerbee Heirs.
>
> d.     Recording the quitclaim deed without her client's informed consent and without informing her clients of the effect of such action.[5]

[¶21]  We analyze the record to see if the Bar proved by clear and convincing evidence Ms. Abromats violated W.R.P.C. 1.3 in each of these four ways.

### A.  Failing to recognize the recorded deed for Parcel Two vested legal fee title in the Earls.

[¶22]  The BPR found the Bar proved by clear and convincing evidence Ms. Abromats violated W.R.P.C. 1.3 by "failing to recognize the recorded deed for [Parcel Two] vested legal fee title in the Earls."  Ms. Abromats asserts this finding is incorrect because the status of the Earls' interest in Parcel Two changed because of the 2015 Transaction.  She asserts the 2015 Agreement for Warranty Deed completely superseded the 2012 Warranty Deed and Mortgage.  She claims although the 2015 Quitclaim Deed was not recorded until July 2022, it still acted to create an effective and enforceable transfer of the title to the property between the Ellerbee Heirs and the Earls in 2015, even if it would not have been effective against a subsequent purchaser.

[¶23]  Ms. Abromats testified at the hearing she only reviewed Curt's first email containing the 2012 Warranty Deed and Mortgage when she formed the impression a foreclosure was the proper course of action.  She further testified she did not see his second email with the documents pertaining to the 2015 Transaction at that time.  Although both emails were sent within a few minutes of each other, she did not "discover" the documents pertaining to the 2015 Transaction until she filed them in her case management program.  After she reviewed the 2015 Transaction, she concluded the 2012 Mortgage was no longer legally enforceable.  She believed the parties now had a contract for deed, and she could not proceed with a foreclosure.  In reaching her conclusions, Ms. Abromats did not have a title office conduct

---

[5] The BPR's report contained no legal analysis of the Wyoming Rules of Professional Conduct, nor does it specify which facts supported its findings Ms. Abromats violated W.R.P.C. 1.3 and 1.4(b).  As we noted in *Hinckley*, "[o]ur ability to give due consideration to the BPR's findings and conclusions is hampered by the report's lack of a detailed legal analysis linking the rules, applicable law, findings and legal conclusions . . . ." 2022 WY 18, ¶ 5, 503 P.3d at 594.  Because the BPR's report does not contain these findings and analysis, we do not know what facts the BPR relied upon when it concluded each rule violation had been established.  We conduct our own review of the record to determine whether the facts prove by clear and convincing evidence Ms. Abromats violated W.R.P.C. 1.3 and 1.4(b) in the ways alleged in the formal charge.

a preliminary title review of the property or provide an opinion on the record ownership of Parcel Two.  Instead, she chose to conduct limited title research herself.

[¶24]   Contrary to Ms. Abromats's conclusions, Bar Counsel's expert witness opined the 2015 Transaction did not invalidate the 2012 Mortgage:

> [THE WITNESS:]  So, in 2012, only one lot was involved.  It was [Parcel Two].  It was a true seller-financed arrangement.  The seller gave a deed, took back a mortgage.  And in 2015 the transaction changed as between Ellerbee and Earl.  A new lot was added, [Parcel One].  There was some kind of what I call a mash-up of a contract for deed on [Parcel One] with an acknowledgment that there was still a deed of record for [Parcel Two] with the mortgage.  So they did a new arrangement in 2015 that appears to have changed in some respects the contractual relationship between Ellerbee and Earl.
>
> [Bar Counsel:]  What effect did the 2015 mash-up have on the state of legal title for the Ellerbees' lot?
>
> [THE WITNESS:]  For [Parcel Two], it had no effect on that.
>
> [Bar Counsel:]  And why is that?
>
> [THE WITNESS:]  Because in 2012 a deed was recorded for [Parcel Two] from Ellerbee to Earl, which put Earl in record title, fee simple title.  Earl remained the record title owner of [Parcel Two] until 2022, when the quitclaim deed was recorded conveying [the] property to [the] Ellerbees.  So nothing that happened in 2015 changed what was of record and changed Earls' record title.
>
> [Bar Counsel:]  In your opinion, what effect did the executed but unrecorded documents in 2015 have upon the state of legal title to the Earls' lot?
>
> [THE WITNESS:]  They had no effect.
>
> [Bar Counsel:]  And why is that?
>
> [THE WITNESS:]  Because under Wyoming law, statutory law, unrecorded documents don't affect record title.  There are

9

some exceptions to that, but the exceptions wouldn't apply here. What determines ownership is what the title is of record.

[Bar Counsel:] And is that a complex legal -- I don't know the word I'm looking for. But when you're dealing with real estate law, is that something that's obscure in the law?

[THE WITNESS:] No. I mean, record title is pretty basic real estate law.

[Bar Counsel:] And based upon what you heard from Ms. Abromats in her testimony this morning, does she understand that concept?

[THE WITNESS:] I don't believe she does. She clearly understands that this contractual relationship between [the] Earl[s] and Ellerbee[s] was very confused as a 2015. And as between those parties, I'm not clear whether they intended their transaction on these two lots to be a true contract for deed or whether it was a contract for deed on one lot and the mortgage on the other lot. All of that is very complex, confusing.

But as to the state of title, that was very clear. Title was in Earl.

[¶25] The Bar's expert also opined it was standard practice to obtain a report from a title company to establish the state of record title to a property before doing any transaction that would change or transfer title to the property. He testified looking through the real estate records and other indexes that affect title is a detailed and complex process, and it is easy to miss things when you do your own title search, as Ms. Abromats did in this case. He further testified the unrecorded documents executed as part of the 2015 Transaction were not binding on the title company or the lienholders, and they did not change the legal or record title to Parcel Two, even if they would have been enforceable between the Ellerbee Heirs and the Earls.

[¶26] We conclude the Bar proved by clear and convincing evidence Ms. Abromats violated Rule 1.3 when she failed to recognize the recorded deed for Parcel Two vested legal title in the Earls. Ms. Abromats did not review all the documents Curt provided at the beginning of the representation before deciding on a course of action. She did not conduct a thorough investigation into the status of the legal and record title to Parcel Two. Because Ms. Abromats conducted an inadequate investigation, she did not understand the status of the legal and record title of Parcel Two, and she failed to recognize the recorded deed for Parcel Two vested legal fee title in the Earls, the Patel and Rocky Mountain liens

attached to Parcel Two, and filing the quitclaim deed impacted her clients' options. Ms. Abromats violated Rule 1.3 when she failed to conduct an adequate investigation, exercise sound professional judgment, and render practical advice. *See* Ann. Model Rules of Pro. Conduct r. 1.3 cmt; Restatement (Third) of the Law Governing Lawyers § 52 cmt. c.

### B. Failing to determine if there were other judgment liens against the Earls upon discovery of the Collection Professionals, Inc., judgment liens.

[¶27] The BPR found Ms. Abromats violated W.R.P.C. 1.3 by "[f]ailing to determine if there were other judgment liens against the Earls upon discovery of the Collection Professionals, Inc., judgment liens." Ms. Abromats contends this finding is incorrect because the Earls' interest in Parcel Two had been converted to an equitable interest, and the liens did not attach to the property. She asserts the only way the Patel and Rocky Mountain liens could have been resolved was through a declaratory judgment action.

[¶28] At the hearing, Ms. Abromats admitted she did not check to see if there were any other judgment liens against Parcel Two or the Earls personally after finding the Collections Professionals liens. She performed the title research herself and did not ask a title company to give her a preliminary review of the title to the properties. She testified she was familiar with Wyoming Statute § 1-17-302 (LexisNexis 2023), which governs when a lien attaches to real property. That statute states:

> The lands and tenements within the county in which judgment is entered are bound for the satisfaction thereof from the day the judgment is filed with the county clerk. Whenever a judgment is required to be filed with the county clerk, it shall be recorded in the real estate records. Goods and chattels of the debtor are bound from the time they are seized in execution.

Wyo. Stat. Ann. § 1-17-302. She admitted if she had looked in the records, she would have discovered the Patel and Rocky Mountain liens. When asked why she did not look for additional liens, she testified:

> Because the Earls only had an equitable interest. And what I did not understand -- and it will, I'm sure, come out in subsequent exhibits -- is whether or not, in a contract for deed, a lien put directly on the property attached. And the reason I was concerned about that is that I am aware of statutes that if a lien is improperly placed upon your property, you have a certain amount of time to respond and object to that lien. And so that was why I looked just in the ones that directly attached to the property.

11

[¶29] Ms. Abromats opined the Patel and Rocky Mountain liens were unenforceable against the Ellerbee Heirs because the Earls only had equitable title to Parcel Two under a contract for deed. She testified she did not anticipate a third party, like a title company, would fail to recognize the liens did not attach to Parcel Two because the Earls only had equitable title to the Property. She admitted she "never did the research" to see if the Collections Professional liens attached to a contract for deed "because [Curt] resolved the liens."

[¶30] The Bar's expert testified the Earls had an equitable interest in Parcel One under the 2015 Transaction, but they maintained a legal, record interest in Parcel Two because of the recorded 2012 Warranty Deed. He explained in a properly structured contract for deed, the deed is escrowed somewhere, and is not actually recorded until the property is paid off. Assuming the deed has not been recorded, the buyer's interest in the property is equitable, not legal, because the deed has not yet been recorded. In this case, he opined the Earls had equitable title to Parcel One until Ms. Abromats recorded the quitclaim deed in 2022, but the Earls had legal title to Parcel Two by virtue of the 2012 Warranty Deed. Therefore, the Patel and Rocky Mountain liens could and did attach to Parcel Two. He opined Ms. Abromats failed to perform her duty of due diligence when she failed to look for these liens or realize they attached to Parcel Two.

[¶31] We find the Bar proved by clear and convincing evidence Ms. Abromats violated Rule 1.3 when she failed to search for additional liens. Had Ms. Abromats conducted an adequate investigation, she would have discovered the Patel and Rocky Mountain liens. If she had done so, she also would have discovered her conflict of interest earlier. Had she conducted proper research, or had a title company perform proper research, she would have realized the Patel and Rocky Mountain liens did attach to Parcel Two and filing the quitclaim deed would have an impact on the Ellerbee Heirs' options for extinguishing those liens. Further, Ms. Abromats admitted she did not research the impact the Collections Professionals liens had on the property prior to recording the quitclaim deed. Ms. Abromats violated Rule 1.3 when she failed to conduct an adequate investigation into the liens on Parcel Two. *See* Ann. Model Rules of Pro. Conduct r. 1.3 cmt; Restatement (Third) of the Law Governing Lawyers § 52 cmt. c.

### C. Failing to foreclose on Parcel Two, which was the scope of Ms. Abromats's engagement by the Ellerbee Heirs.

[¶32] The BPR found Ms. Abromats violated Rule 1.3 by "[f]ailing to foreclose on the subject property, which was the scope of [her] engagement by the Ellerbee heirs." The BPR's report does not explain the basis for this finding. At the hearing, Bar Counsel asserted W.R.P.C. 1.2 requires lawyers to have a clear understanding of the scope of the representation, and Ms. Abromats varied from the scope of the representation in this case without obtaining her client's informed consent. He asserted Ms. Abromats violated Rule 1.3 by not obtaining her client's consent to vary from the scope of the representation. The

12

Formal Charge makes no reference to Rule 1.2. The allegations pertaining to this charge do not clearly and with particularity assert it was a violation of Rule 1.2—varying from the scope of the representation—that was the conduct that formed the basis for this charge. *See* W.R.D.P. 13(a). As discussed above, our review is limited to the charges where an attorney was provided notice of the facts, alleged misconduct, and rules violated. *Austin*, 2023 WY 110, ¶ 11, 538 P.3d at 658 (citing *Hinckley*, 2022 WY 18, ¶¶ 7–9, 503 P.3d at 594–95). Therefore, we will not consider whether Ms. Abromats violated Rule 1.2 or exceeded the scope of her representation, and we will only focus on whether the Bar proved by clear and convincing evidence Ms. Abromats violated Rule 1.3 by not foreclosing on Parcel Two. We conclude it did not.

[¶33]  At the hearing, the Bar's expert testified Ms. Abromats failed to recognize her clients had the option to either foreclose on the mortgage or file the quitclaim deed and evict the Earls.  The Ellerbees could have foreclosed on the mortgage and thereby extinguished any junior liens, which may have taken four to six months and given the Earls a right of redemption, or they could have chosen to file the quitclaim deed and have the Earls removed from the property in less than 30 days.  The Bar's expert testified Ms. Abromats had a third option. Prior to filing the quitclaim deed, she could have filed a declaratory judgment action or quiet title suit to figure out the relative priorities of the liens. Once Ms. Abromats recorded the quitclaim deed, foreclosing the mortgage was no longer an option.  The Bar's expert was not necessarily critical of Ms. Abromats not foreclosing on the property.  Rather, he was critical of her deciding to file the quitclaim deed without comprehending the impact of that decision and discussing the possible options with her clients.

[¶34]  As the Bar's expert pointed out, there may have been a legitimate reason to choose to file the quitclaim deed instead of pursuing the foreclosure.  The costs and delays of the foreclosure proceeding may have exceeded the cost of settling the liens and getting the Earls removed from the property quickly.  The problem in this case is Ms. Abromats did not fully investigate the underlying facts and documents involved, so she did not realize her clients had multiple options available to them.  Had Ms. Abromats conducted an adequate investigation her clients could have made an informed decision on which option to choose.  They may have decided not to pursue foreclosure.  Under the unique circumstances of this case, we cannot say failing to foreclose on Parcel Two was a violation of Rule 1.3.

####   D.  Recording the quitclaim deed without her clients' informed consent and without informing her clients of the effect of such action.

[¶35]  The BPR found Ms. Abromats violated Rule 1.3 by "[r]ecording the quitclaim deed without her clients' informed consent and without informing her clients of the effect of such action." Although Ms. Abromats objects to this finding, her brief does not specifically

13

analyze why it is incorrect. She does allege she recorded the quitclaim deed "with the help of the Ellerbee children . . . ."

[¶36] At the hearing, Ms. Abromats testified she had a "continual conversation" with Curt about recording the quitclaim deed, and he obtained the original deed from his sister and sent it to Ms. Abromats along with the $12 fee for recording the deed. Although Ms. Abromats told Curt she would have to research whether the Collections Professionals liens ran with the land, Ms. Abromats admitted she never performed this research before filing the quitclaim deed. She also admitted she did not have a great deal of experience with contracts like the ones at issue in this case. When asked if she advised Curt of the consequences of filing the quitclaim deed before taking that action, Ms. Abromats testified:

> [Ms. Abromats:] There were no consequences. There should not have been any consequences.
>
> [Bar Counsel:] Did you inform him of what the consequences would be?
>
> [Ms. Abromats:] I have answered your question. There should not have been any consequences.

Ms. Abromats admitted she never explained her analysis of the equitable versus legal interest to the Ellerbee Heirs before she filed the quitclaim deed.

[¶37] We conclude the Bar proved by clear and convincing evidence Ms. Abromats violated Rule 1.3 when she recorded the quitclaim deed without her clients' informed consent and without informing her clients of the effect of such action. Ms. Abromats failed to conduct an adequate investigation, exercise sound professional judgment, render practical advice, or fully inform her client before choosing to file the quitclaim deed. *See* Ann. Model Rules of Pro. Conduct r. 1.3 cmt; Restatement (Third) of the Law Governing Lawyers § 52 cmt. c.

## II. *Does the record contain clear and convincing evidence Ms. Abromats violated Rule 1.4(b)?*

[¶38] Ms. Abromats was charged with violating W.R.P.C. 1.4(b) by "failing to inform her clients of the legal options available to them (i.e. foreclosure vs. recording the quitclaim deed) and the consequences of each option." Rule 1.4(b) states in relevant part: "A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation. . . ." Comment 6 to this rule states: "[t]he client should have sufficient information to participate intelligently in decisions concerning the objectives of the representation and the means by which they are to be pursued, to the extent the client is willing and able to do so." W.R.P.C 1.4 cmt. 6. An attorney must explain

the legal effect of executing a legal document, including the risks, benefits, and alternatives. Ann. Model Rules of Pro. Conduct r. 1.4 cmt. (Am. Bar. Ass'n 2023). "When a lawyer is aware of facts suggesting a client's objectives in a transaction are at risk, the lawyer must apprise the client of those facts and their legal implications so the client can make an informed decision about alternative courses of action." *Id.*

[¶39]  Ms. Abromats asserts she did not violate W.R.P.C. 1.4(b) by failing to advise the Ellerbees about the available options.  She asserts filing the quitclaim deed was the only option.  Ms. Abromats claims the evidence at the hearing shows she communicated regularly with Curt by phone and email, and the Bar failed to present any contrary evidence.

[¶40]  At the hearing, Ms. Abromats admitted she "never sat down and talked to [the Ellerbee Heirs] about equitable versus legal interest.  [She] did not explain to them, the difference."  Instead, she "assumed [they] were all on the same page."  She also testified she did not explain the consequences of filing the quitclaim deed because there "should not have been any consequences."

[¶41]  We conclude the Bar presented clear and convincing evidence Ms. Abromats violated W.R.P.C. 1.4(b) by failing to inform her clients of the legal options available to them and the consequences of each option.  Ms. Abromats's testimony established she did not explain her legal analysis to the Ellerbee Heirs before switching course from a foreclosure to filing the quitclaim deed.  As discussed in detail above, she failed to conduct an adequate investigation, exercise sound professional judgment, or render practical advice.  In failing to adequately investigate the facts and documents involved, Ms. Abromats did not understand her clients had at least two, if not three, options available to them.  Ms. Abromats did not explain the foreclosure and quitclaim process to the extent reasonably necessary to permit the Ellerbee Heirs to make an informed decision regarding the representation. W.R.P.C. 1.4(b).  She did not explain the legal effect of filing the quitclaim deed, including the risks, benefits, and alternatives. *See* Ann. Model Rules of Pro. Conduct r. 1.4 cmt.  The Bar proved by clear and convincing evidence Ms. Abromats violated W.R.P.C. 1.4(b).

### III.   *If the charges are supported by clear and convincing evidence, is public censure the appropriate sanction under Wyoming Rules of Disciplinary Procedure 15(b)(3)(D)?*

[¶42]  Having found Ms. Abromats violated Rules 1.3 and 1.4(b), we move to the issue of what sanction is appropriate for her conduct.  The BPR recommended a public censure as the appropriate sanction in this case.  Ms. Abromats asserts public censure is not warranted in this case because any harm to the Ellerbee Heirs "came about due to third party positions that Respondent did not anticipate and that could have been resolved with further court proceedings."

15

[¶43]   W.R.D.C. 15(b)(3)(D) provides the general standard for determining the appropriate sanction for attorney misconduct:

> (D) In imposing a sanction after a finding of misconduct by the respondent, the Hearing Panel shall consider the following factors, as enumerated in the ABA Standards for Imposing Lawyer Sanctions, which standards shall be applied by the Hearing Panel in determining the appropriate sanction:
> (i) Whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession;
> (ii) Whether the lawyer acted intentionally, knowingly, or negligently;
> (iii) The amount of the actual or potential injury caused by the lawyer's misconduct; and
> (iv) The existence of any aggravating or mitigating factors.

*See also* ABA Standards 3.0 at 125 ("In imposing a sanction after a finding of lawyer misconduct, a court should consider the following factors: (a) the duty violated; (b) the lawyer's mental state; (c) the potential or actual injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors.").

> For purposes of determining the proper sanctions, "intent" is defined in the ABA Standards as "the conscious objective or purpose to accomplish a particular result." "Knowledge" is defined as "the conscious awareness of the nature or attendant circumstances of his or her conduct but without the conscious objective or purpose to accomplish a particular result." "Negligence" is defined as the "failure of the lawyer to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation." "Injury" is defined as "harm to a client, the public, the legal system, or the profession which results from a lawyer's misconduct. The level of injury can range from 'serious' injury or 'little to no' injury." "Potential injury" is "the harm to a client, the public, the legal system or the profession that is reasonably foreseeable at the time of the lawyer's misconduct, and which, but for some intervening factor or event, would probably have resulted from the lawyer's misconduct."

*Hinckley*, 2022 WY 18, ¶ 78, 503 P.3d at 612–13 (citing ABA Standards, Definitions).

16

[¶44] ABA Standards 4.0 through 8.4 are grouped in terms of whether the duty the attorney violated was owed to the client, the public, the legal system, or the profession. *Id.* at ¶ 79, 503 P.3d at 613. Ms. Abromats's violations of Rules 1.3 and 1.4(b) violated a duty owed to a client. ABA Standard 4.4, "Lack of Diligence," addresses the presumptive levels of sanctions that should be imposed when an attorney violates Rules 1.3 and 1.4. *Id.* at ¶ 80, 503 P.3d at 613; *Crawford-Fink*, 2018 WY 130, 430 P.3d at 333. That standard states:

> 4.4 Lack of Diligence
> Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving a failure to act with reasonable diligence and promptness in representing a client:
>
> 4.41 Disbarment is generally appropriate when:
> (a) a lawyer abandons the practice and causes serious or potentially serious injury to a client; or
> (b) a lawyer knowingly fails to perform services for a client and causes serious or potentially serious injury to a client; or
> (c) a lawyer engages in a pattern of neglect with respect to client matters and causes serious or potentially serious injury to a client.
>
> 4.42 Suspension is generally appropriate when:
> (a) a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client, or
> (b) a lawyer engages in a pattern of neglect [and] causes injury or potential injury to a client.
>
> 4.43 Reprimand is generally appropriate when a lawyer is negligent and does not act with reasonable diligence in representing a client, and causes injury or potential injury to a client.
>
> 4.44 Admonition is generally appropriate when a lawyer is negligent and does not act with reasonable diligence in representing a client, and causes little or no actual or potential injury to a client.

ABA Standards, 4.4 at 194, 200, 207, 209.

[¶45] The record supports a finding Ms. Abromats acted negligently. Ms. Abromats acknowledged she did not deal with contracts very often in her practice. Despite her inexperience and the complex nature of the contracts at issue in this case, she did not hire a title company to conduct a preliminary title review of the property or provide an opinion on the record ownership of the property, and she conducted limited title research herself. In doing so, she failed to discover the Patel and Rocky Mountain liens. She did not adequately research the options that were available to her clients under the 2015 Transaction or review all the documents her client sent to her. Consequently, she did not realize the significance of filing the quitclaim deed. Ms. Abromats "deviat[ed] from the standard of care that a reasonable lawyer would exercise in the situation" and was negligent. *Hinckley*, 2022 WY 18, ¶ 78, 503 P.3d at 612–13 (citing ABA Standards, Definitions).

[¶46] We next consider whether there are any aggravating or mitigating circumstances. *Austin*, 2023 WY 110, ¶ 47, 538 P.3d at 667; W.R.D.P. 15(b)(3)(D); ABA Standards 3.0 at 125. The ABA Standards list several aggravating and mitigating circumstances that may be considered when determining the appropriate level of sanction. *See* ABA Standards 9.1– 9.4 at 444, 451, 487, and 547.

> 9.2 Aggravation
>
> 9.21 Definition. Aggravation or aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed.
>
> 9.22 Factors which may be considered in aggravation. Aggravating factors include:
> (a) prior disciplinary offenses;
> (b) dishonest or selfish motive;
> (c) a pattern of misconduct;
> (d) multiple offenses;
> (e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency;
> (f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;
> (g) refusal to acknowledge wrongful nature of conduct;
> (h) vulnerability of victim;
> (i) substantial experience in the practice of law;
> (j) indifference to making restitution;
> (k) illegal conduct, including that involving the use of controlled substances.

18

9.3 Mitigation

9.31 Definition. Mitigation or mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed.

9.32 Factors which may be considered in mitigation. Mitigating factors include:
   (a) absence of a prior disciplinary record;
   (b) absence of a dishonest or selfish motive;
   (c) personal or emotional problems;
   (d) timely good faith effort to make restitution or to rectify consequences of misconduct;
   (e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings;
   (f) inexperience in the practice of law;
   (g) character or reputation;
   (h) physical disability;
   (i) mental disability or chemical dependency including alcoholism or drug abuse when:
      (1) there is medical evidence that the respondent is affected by a chemical dependency or mental disability;
      (2) the chemical dependency or mental disability caused the misconduct;
      (3) the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and
      (4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely;
   (j) delay in disciplinary proceedings.
   (k) imposition of other penalties or sanctions;
   (l) remorse;
   (m) remoteness of prior offenses.

9.4 Factors That Are Neither Aggravating Nor Mitigating
The following factors should not be considered as either aggravating or mitigating:
   (a) forced or compelled restitution;
   (b) agreeing to the client's demand for certain improper behavior or result;
   (c) withdrawal of complaint against the lawyer;

(d) resignation prior to completion of disciplinary proceedings;

(e) complainant's recommendation as to sanction;

(f) failure of injured client to complain.

ABA Standards, Standards 9.2–9.4 at 451, 487, and 547. The BPR applied the following aggravating factors: "(1) refusal to acknowledge wrongful nature of conduct; (2) substantial experience in the practice of law; and (3) indifference in making restitution." The BPR applied the following mitigating factors: "(1) absence of a prior disciplinary record; (2) absence of a dishonest or selfish motive; and (3) full and free disclosure to disciplinary board or cooperative attitude toward proceedings."

[¶47] Ms. Abromats does not specifically address any of these aggravating or mitigating factors in her brief. Instead, she argues her interpretation of the law was correct and any harm to her clients was not the result of her conduct. This argument shows Ms. Abromats still refuses to acknowledge the wrongfulness of her conduct and continues to show indifference in making restitution. Ms. Abromats has been practicing law since 2014. Therefore, the BPR properly applied the aggravating factors in ABA Standard 9.22(g), (i), and (j). The record reflects Ms. Abromats does not have a prior disciplinary record, was not acting with a dishonest or selfish motive, and was cooperative with the proceeding. ABA Standards 9.32(a), (b), and (e). The BPR correctly applied those mitigating factors.

[¶48] As set forth in the ABA standards and the Wyoming Rules of Disciplinary Procedure, a reprimand (public censure) is issued instead of an admonition (private reprimand) when the client has been injured by the attorney's conduct. *See* ABA Standards 4.43, 4.44 at 207, 209; W.R.D.P. 9(a)(3), (4). As discussed above, the ABA Standards define an "injury" as "harm to a client . . . which results from a lawyer's misconduct. The level of injury can range from 'serious' injury or 'little to no' injury." *Hinckley*, 2022 WY 18, ¶ 78, 503 P.3d at 612–13 (citing ABA Standards, Definitions). As a result of Ms. Abromats's unilateral decision to file the quitclaim deed, the Patel and Rocky Mountain liens attached to Parcel Two, and the Ellerbee Heirs had to pay more than $13,000 out of the proceeds from the sale of the property to satisfy those two liens. Had Ms. Abromats proceeded with a foreclosure, those junior liens would have been extinguished. However, as the Bar's expert testified, there may have been reasons the Ellerbee Heirs would have chosen to proceed with filing the quitclaim deed instead of pursuing the foreclosure. Because the Ellerbee Heirs may have ultimately chosen to file the quitclaimed deed, the harm that resulted from Ms. Abromats's conduct in this case is not simply the money they expended to satisfy the liens. Rather, it is the lost opportunity to make an informed decision about which course of action to pursue.

[¶49] Ms. Abromats negligently violated Rules 1.3 and 1.4(b) of the Wyoming Rules of Professional Conduct. The aggravating factors in ABA Standard 9.22(g), (i), and (j) apply. The mitigating factors in ABA Standard 9.32(a), (b), and (e) apply. Her failure to proceed

with due diligence and communicate with her client caused injury to the Ellerbee Heirs. Public censure is the appropriate sanction for Ms. Abromats's violations of the Rules.

## DISCIPLINARY ORDER

**IT IS, THEREFORE, ORDERED THAT:**

1. Letitia C. Abromats is hereby publicly censured for her violations of Rules 1.3 and 1.4(b);

2. Letitia C. Abromats shall complete three (3) hours of continuing legal education on the subjects of deeds, mortgages, and real estate transactions.

3. By June 2, 2025, Letitia C. Abromats shall pay costs in the amount of $2,616.15 associated with the disciplinary proceedings and an administrative fee of $750[6] to the Wyoming State Bar. W.R.D.P. 25.

4. The Wyoming State Bar may issue a press release summarizing this Court's order.

Dated this 21st day of May, 2025.


BY THE COURT.

---

[6] The Affidavit of Costs and Expenses filed by the BPR asked for an administrative fee of $800. The administrative fee set by W.R.D.P. 25 is $750. The BPR did not present any receipts showing it incurred any additional costs in the amount of $50, so this Court will not assess that amount against Ms. Abromats.